LANGDON L. SKARDA, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 54407–54414.   Filed October 31, 1956.

*Wentworth T. Durant, Esq.*, and *Lynell G. Skarda, Esq.*, for the petitioners.

*John P. Higgins, Esq.*, for the respondent.

---

[1] The following proceedings are consolidated herewith: Carolyn A. Skarda, Docket No. 54408; Lynell G. Skarda and Kathryn B. Skarda, Docket No. 54409; Lynell G. Skarda, Docket No. 54410; Kathryn B. Skarda, Docket No. 54411; Cash T. Skarda and Annabel S. Skarda, Docket No. 54412; Cash T. Skarda, Docket No. 54413; and Annabel S. Skarda, Docket No. 54414.

OPINION.

MULRONEY, *Judge:* Lynell G. Skarda, the only witness at the trial, testified that he and his two brothers were licensed attorneys living in Clovis, New Mexico. He was actively engaged in the practice of law but his brothers were engaged in other businesses. In 1942, the three Skarda brothers, in addition to their regular businesses, formed a partnership to operate farming interests. The partnership invested heavily in cattle from 1946 through the tax years involved. In 1949, they decided to start, and did start, a newspaper in Clovis, New Mexico. They immediately took steps to incorporate the business. The newspaper was a losing proposition from start to finish and the petitioners advanced, in addition to capital of $25,104.91, the sum of $84,300 to keep the company going. In 1949 and 1950, the petitioners claimed business bad debt deductions for losses sustained from advancements they made to the newspaper.

The petitioners contend in the alternative that these losses were deductible as business expenses under section 23 (a) (1) (A), business losses under section 23 (e) (1) and (e) (2), or business bad debts under section 23 (k) (1)[3]. The respondent, on the other hand, contends that the losses were nonbusiness bad debts within the meaning of section 23 (k) (4), and that such debts, being only partially worthless in 1949 or 1950, are not deductible under section 23 (k) (4)[4] in those years.

The petitioners make alternative arguments that (1) the Chronicle Publishing Co. never came into existence as a corporation, therefore all of the expenses or losses were their own; (2) if it did come into existence, it should be disregarded as a sham with the same results

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

* * * * * *

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in trade or business; or

(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or

* * * * * * *

(k) BAD DEBTS.—

(1) GENERAL RULE.—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *

[4] (4) NON-BUSINESS DEBTS.—In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

144

as above; (3) if not so regarded, the corporation should be found to have been an agent of the partnership with the same results as above; and (4) finally, if found to be a valid corporation which published the Chronicle for itself, then the bad debts resulting from the money loaned to the company should be considered business bad debts, thereby allowing partial bad debt deductions for 1949 and 1950. We feel that the petitioners have failed to carry their burden of proving error in the determinations of the Commissioner.

Our first concern is with the legal creation of the company as a corporation. In December 1948, articles of incorporation were filed with the proper authorities in New Mexico. Certificates of comparison and incorporation were subsequently issued in common form for the company. These were properly filed in Curry County, where the company was located, and the petitioners paid the filing fees as required. Notice of incorporation was duly published by the petitioners in a county newspaper. The articles of incorporation named the three Skarda brothers as incorporators, subscribing to 4 shares of stock each, and as having authority to act as directors for the first 3 months of incorporation.

The petitioners held the company out to the public as a corporation. A sworn statement of ownership was published in the Chronicle by the petitioners, declaring that the newspaper was owned by the company and that the three Skarda brothers were sole stockholders in the "Chronicle Publishing Co., a corporation." The company secured an employer's identification number; filed quarterly returns of income tax withheld; and filed employer's tax returns—all as a corporation.

The petitioners contend that the corporation never came into existence since they failed to hold stockholders' meetings, adopt bylaws, elect officers, keep minute books, and issue stock. At this point it might be well to quote from chapter 54, section 211, New Mexico Statutes, Annotated (1941) as follows:

Upon making the certificate of incorporation and causing the same to be filed, and a certified copy thereof recorded as aforesaid, and paying the filing fees therefor, the persons so associating, * * * shall from the time of such filing * * * be and constitute a body corporate, by the name set forth in said certificate, * * *

Under this statute it is obvious that the corporation was in existence to the extent that the State of New Mexico recognized it as a separate jural entity authorized to do business as a body corporate in New Mexico. In other words, the conditions precedent to the creation of a corporate body were complied with by the petitioners. The State of New Mexico, having breathed life into the corporation, and it having complied with the laws of that State giving it the right to transact business under its charter, a separate entity came into being, be it de

jure or de facto, which will not be ignored except under unusual circumstances. *Fleming G. Railey*, 36 B. T. A. 543.

The petitioners argue long and forcefully and cite many cases to the effect that a corporate body which does no business is but an empty shell which may be ignored as unreal and a sham, contending that the company was such a corporation, if a corporation at all. While generally a corporation must be regarded as a separate taxable entity, *Burnet* v. *Commonwealth Imp. Co.*, 287 U. S. 415, we recognize that there are exceptional circumstances whereby the corporate entity may be disregarded as unreal or a sham. *Moline Properties, Inc.* v. *Commissioner*, 319 U. S. 436.

Whether or not a corporation should be disregarded as unreal or a sham seems to rest upon whether or not its creation was followed by business activity. In analyzing the three leading decisions of the Supreme Court on this issue, *Burnet* v. *Commonwealth Imp. Co.*, *supra; Higgins* v. *Smith*, 308 U. S. 473; and *Moline Properties, Inc.* v. *Commissioner*, *supra*, the court, in *National Investors Corporation* v. *Hoey*, 144 F. 2d 466, stated:

to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, * * * the term "corporation" will be interpreted to mean a corporation which does some "business" in the ordinary meaning; * * *

We believe that the formation of the Chronicle Publishing Co. was followed by business activity in the ordinary meaning.

This business activity began with the publishing of a newspaper which it published under its corporate name from March 20, 1949, to February 1, 1950. All business of the Chronicle was transacted under the corporate name. A checking account in the name of the Chronicle Publishing Co. was maintained, from which approximately 3,000 checks were drawn by the company president or secretary in payment for company services and supplies. The petitioners had an accountant set up a complete set of books for the company. These books contained a credit of $25,104.91 to the "Capital stock" account, representing money actually spent for equipment and supplies for the company, or cash deposited to the account of the company. The petitioners, in effect, transferred to the company the newspaper press and other equipment previously purchased by them. This was done when their personal conditional sales contract and note were caused to be canceled, and new ones, executed by the company, substituted therefor. The company thereby assumed all liability for the equipment under a contract and note signed and sealed by Lynell G. Skarda, president, and attested to by Charles T. Skarda as secretary of the Chronicle Publishing Co. Day-to-day supplies were delivered to the company in its name, billings were made in the company name, and a

company check was drawn in payment therefor. In other words, in the vernacular of the business world, the company was extended short-term commercial credit. The company borrowed money from Skarda Bros. and executed notes therefor. We note here that as late as October 13, 1950, when the last loan was made, the petitioners were very careful in obtaining properly executed notes from the company for each loan. We believe that all of this evidence indicates that more than "some business" was carried on by the company.

The petitioners cite and rely heavily on *Paymer v. Commissioner*, 150 F. 2d 334, affirming in part and reversing in part a Memorandum Opinion of this Court. In that case there were two corporations created by the taxpayers to hold title to real estate. One of the corporations, Westrich, was found by the court, in reversing the Tax Court, to be "a passive dummy which did nothing but take and hold the title to the real estate* * *." This corporation was characterized as a sham. The other corporation, Raymep, was identical in nature to Westrich with one distinguishing exception. This was that Raymep had obtained a loan and to secure it had assigned to the lender its rights as lessor in two leases to property to which it held title. This distinguishing feature was sufficient for the court to sustain the Tax Court's decision and determine it to be a taxable entity. The court said of Raymep:

> We think that Raymep was active enough to justify holding that it did engage in business in 1938. The absence of books, records and offices and the failure to hold corporate meetings are not decisive on that question. Though Raymep was organized solely to deter creditors of one of the partners, it apparently was impossible or impracticable to use it solely for that purpose when it became necessary or desirable to secure the above mentioned loan. * * *

Certainly there was more business activity transacted by the company here than by Raymep. We therefore hold that the Chronicle Publishing Co. was engaged in sufficient business in 1949 and 1950 to classify it a separate entity.

Petitioners next contend that if the company had a corporate existence in the beginning, its charter and the right to do business in New Mexico were forfeited and corporate existence ended on May 4, 1949, for failure of the corporation to make a required report to the New Mexico Corporation Commission. To this proposition we are unable to agree. Chapter 54, section 236, New Mexico Statutes, Annotated (1941), concerning corporations which have forfeited their charter and right to do business under this chapter for failure to make the report, provides:

> Any corporation in this class may be fully revived by the resumption of active business and the filing of the annual report contemplated by the provisions of this section.

Lynell G. Skarda testified that subsequent to the forfeiture on May 4, 1949, the required report was duly filed. We think this indicated that the petitioners wanted to do everything necessary to maintain the corporate entity. There is nothing in the record to indicate that the business activity of the company was interrupted or changed in the slightest by or after the notice of forfeiture. Whether the company, after the forfeiture of its charter, was a de jure or a de facto corporation, or whether it was merely an association operating in the same form or manner as a corporation, we need not decide. It is sufficient to say that it falls within the classification of entities taxable as corporations under the revenue acts. *Calvin Zimmerman*, 31 B. T. A. 754.

The petitioners further contend that if we determine that a corporate entity existed in 1949 and 1950, we should also find that it was an agent of the partnership. This agency argument "is basically the same argument of identity in a different form." *Moline Properties, Inc., supra.* However, we need not go into the merits of the argument since there is no evidence in the record that an agency relationship existed between the partnership and the company. There was no contract of agency, nor the usual incidents of an agency relationship, therefore we hold that the company in publishing the Chronicle was not an agent of the partnership. The petitioners' argument that they should be permitted to deduct as their own all of the expenses in publishing the Chronicle as business expenses under section 23 (a) (1) (A) is now disposed of since the expenses were those of the company, which we have concluded is a separate entity.

The petitioners' last argument is that if we should find that the company was a corporate entity, then we should allow them to claim business loss deductions as provided in section 23 (e) (1) and (e) (2), or business bad debt deductions which they claimed in 1949 and 1950, under section 23 (k) (1). The respondent does not contend that the advancements in excess of $25,104.91 were additions to capital, therefore we will consider them to be bona fide loans. The petitioners do not contend that the nonsecured debts became totally worthless in 1949 or 1950, therefore any deductions under section 23 (k) (4) would be prohibited.

Sections 23 (e) and 23 (k) of the Code are mutually exclusive. *Charles G. Berwind*, 20 T. C. 808. The special provisions as to debts in section 23 (k) indicate that debt losses are not to be regarded as other losses sustained under section 23 (e). *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. Here we have an obvious debtor-creditor relationship; therefore the losses which resulted from the relationship can be deducted only under the provisions of section 23 (k). This

leaves only the petitioners' argument with respect to section 23 (k) (1) to be determined.

Section 23 (k) (1), as negatively defined by section 23 (k) (4), allows a bad debt, incurred in a trade or business, to be deducted in the full amount of the loss in the year in which it becomes worthless in part or in full. In other words, the petitioners must prove that the loss resulting from the worthlessness of the debts was proximately related to a trade or business of their own at the time the debts became worthless. We do not think that they have proved this.

Generally speaking, a bad debt resulting from a loan to a corporation by its stockholders would not be considered a business bad debt because the loss therefrom would not be proximately related to a trade or business of the stockholder. A corporation and its stockholders are generally to be treated as separate taxable entities, *Burnet* v. *Clark*, 287 U. S. 410. Consequently, the business of the corporation cannot be considered the business of the several stockholders. *Dalton* v. *Bowers*, 287 U. S. 404; *Estate of William P. Palmer, Jr.*, 17 T. C. 702; and *Jan G. J. Boissevain*, 17 T. C. 325. The fact that Lynell G. Skarda devoted most of his time to the business of the corporation does not alter this conclusion. Skarda's activities in managing the business of the corporation for the corporation cannot in the same breath be held to constitute the conduct of a separate business. *Jan G. J. Boissevain, supra.*

A worthless debt, resulting from a loan by a stockholder to his corporation, may qualify as a business bad debt if the stockholder was in reality engaged in the trade or business of promoting, organizing, managing, financing, and making loans to business enterprises. *Henry E. Sage*, 15 T. C. 299; *Vincent C. Campbell*, 11 T. C. 510. In such a case the taxpayer, though a stockholder in the corporation to which he loaned money, is also in the business of being a "promoter" of business enterprises, and the loss resulting from the bad debt would be proximately related to that business. We determined in *Charles G. Berwind, supra*, that the authority contained in such "promoter" cases as those cited above, "is applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves."

The petitioners do not contend that they were in the business of loaning money to corporations, and even if they had, the evidence does not support such a claim. The petitioners, by inference, do contend that they come within the forenamed "promoter" cases. The record does not support this contention either. This nebulous business requires that substantial time and effort be expended in *various enterprises* to an extensive degree. The record discloses that the company

was the only enterprise in which the petitioners put any time and effort, and was the only enterprise to which the petitioners loaned money. Their real estate "venture" consisted of one purchase of pasture land. As to their cattle ventures, in which the petitioners invested heavily, it was stated by Lynell G. Skarda, "Well, usually the way they [cattle ventures] were carried on was that we would furnish the money and others would do the work." It was not contended that these investments were loans. We do not think that the passive investing in cattle, the purchase of pasture land, and the organizing, managing, and financing and loaning money to one corporation was sufficient to constitute a separate and distinct business within the intendment of the "promoter" line of cases.

After carefully considering all of the evidence, we conclude that the petitioners were not in the separate and distinct business of publishing a newspaper, making loans to corporations, or promoting, organizing, managing, and financing business ventures. We therefore hold that the losses sustained were not proximately related to any business of the petitioners and therefore are not deductible under section 23 (k) (1).

We find that the gross receipts of the partnership, Skarda Bros., were understated in the amount of $196.62 for the year 1949.

We find that the additions to the tax for substantial underestimate of estimated tax and for failure to file declaration of estimated tax were properly determined for 1950 against Langdon L. Skarda and Carolyn A. Skarda.

*Decisions will be entered for the respondent.*