Herald A. O'Neill and G. Evelyn O'Neill, his wife v. Commissioner.
O'Neill v. Commissioner
Docket No. 57919.
United States Tax Court
T.C. Memo 1957-193; 1957 Tax Ct. Memo LEXIS 57; 16 T.C.M. (CCH) 872; T.C.M. (RIA) 57193; October 11, 1957
Herald A. O'Neill, 304 Spring Street, Seattle, Wash., pro se. John H. Welch, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in the petitioners' income taxes for the years 1951 and 1952 and made additions to the tax under section 294(d), I.R.C. 1939, for failure to file a declaration of estimated tax and for substantial underestimate of estimated tax, as follows: Additions to Tax
Year
Deficiency
Section 294(d)
1951
$ 1,538.04
$ 194.21
1952
11,033.40
1,670.00
Certain adjustments *58 made by the Commissioner, pertaining to the year 1951 were not contested. The parties have stipulated other adjustments to be made to the petitioners' income tax liability for the year 1951. The petitioners filed an amended petition alleging error in the Commissioner's failure to allow a deduction of $5,541.67 in 1951 as a result of a loss to Herald A. O'Neill in a transaction in which he was an escrow agent. There are three issues for consideration: (1) whether, as a result of advances made by Herald A. O'Neill and Phoebe T. O'Neill to and in connection with the business of the Eagle Timber and Mill Company during the years 1946 through 1949, petitioners are entitled to a deduction in 1952 for a bad debt which allegedly became worthless, or a loss from a transaction entered into for profit which allegedly was sustained, that year; (2) whether the petitioners are entitled to a deduction for a loss incurred in a trade or business in 1951 as a result of a transaction in which Herald was an escrow agent; and (3) whether the petitioners are liable for additions to tax under section 294(d) for the years 1951 and 1952. Findings of Fact Some of the facts are stipulated. Those facts are *59 found as stipulated and with the pertinent exhibits are incorporated herein by this reference. The petitioners, Herald A. O'Neill and G. Evelyn O'Neill, are husband and wife. They were married August 23, 1951, and reside in Seattle, Washington. The petitioners filed joint income tax returns for the years 1951 and 1952 with the district director of internal revenue at Tacoma, Washington. Evelyn is Herald's second wife. He married his first wife, Phoebe T. O'Neill, on July 6, 1927, and was divorced from her on August 20, 1951. Herald's trade or business during the taxable years and all related periods was that of an attorney. On September 4, 1946, Herald purchased certain timber property, hereinafter referred to as the Timber Property, from H. H. and Mildred Longenecker. The latter parties executed on October 24, 1946, a statutory warranty deed and bill of sale which named the Eagle Timber and Mill Company, hereinafter referred to as Eagle Timber, as grantee. The statutory warranty deed and bill of sale was filed with the Auditor of King County, Washington, on January 6, 1947. The stated consideration for the conveyance was $10. The deed provided that the property conveyed thereunder *60 was subject to all taxes, mortgages, unpaid balances on contracts, labor accounts and debts of the grantors incurred and payable with reference to the property. On September 9, 1946, Herald executed an option to purchase certain portable sawmill machinery, hereinafter referred to as the Sawmill, from the Webster-Brinkley Co. for $18,500. The Sawmill was at that time located on the Timber Property. Herald extended the option eight times, and finally on October 18, 1948, completed the purchase. Herald transferred the Sawmill to Eagle Timber prior to February 3, 1947. Eagle Timber was incorporated as a Washington corporation on October 22, 1946. Its Articles of Incorporation were filed with the Secretary of the State of Washington at Olympia, Washington. The incorporators were Herald, Phoebe, and Tim Healy. The purpose of the corporation was to engage in a general logging, milling, plywood, timber, and lumber business. On February 18, 1947, Articles of Incorporation also were filed with the Auditor of King County. Filing fees were paid to the State of Washington and King County. On December 27, 1946, Eagle Timber executed a promissory note secured by a mortgage on the Timber Property *61 in favor of C. F. Dally, in the amount of $24,908.49, which amount included a note given to Dally by H. H. Longnecker for $12,500, which note was secured by mortgages upon the Timber Property. Herald also executed a written guarantee at that time in which he agreed to protect personally and keep unencumbered the timber and agreed that the corporation would properly account for the stumpage due the mortgagee. On May 4, 1948, Dally assigned the mortgage to the Seattle-First National Bank. On February 3, 1947, Eagle Timber executed a real estate and chattel mortgage in favor of Herbert D. Norris as security for a promissory note in the amount of $25,000. The mortgage security was the Timber Property and the Sawmill. The mortgage provided that: "[the] Mortgagor is the owner of said property, has good right and authority to mortgage the same, will defend the title to said property unto Mortgagee, except as stated herein, successors and assigns, against all claims whatsoever, and will provide Mortgagee promptly, and in no event later than ten (10) days after date hereof, or upon Mortgagee's demand, with all the documents, proofs and instruments governing title to said property, which *62 any public authority or Mortgagee may request." Norris came into the Eagle Timber venture at the same time, paying Herald $10,000. On May 12, 1950, Herald agreed to purchase all the right, title, and interest of every kind and character, of Norris, relating to the business of Eagle Timber, for $16,000, and on or before December 31, 1952, paid $2,000 on account of the purchase price thereof. On July 24, 1948, Eagle Timber, as vendor, agreed to sell the Timber Property and the Sawmill to Sterling Timber and Lumber Company, for $90,000, payable in installments. This transaction was never completed but was abandoned by the purchaser. In 1948 Eagle Timber was a defendant in an action commenced by the Buda Engine & Equipment Co., Inc., in the Superior Court of the State of Washington for King County. During the years 1946 through 1949, $20,556.60 was paid from community funds of Herald and Phoebe in connection with the business of Eagle Timber. This amount included $18,500 paid to acquire the Sawmill from the Webster-Brinkley Company. On June 12, 1950, Herald executed an assignment of interest in a fund on deposit with the Circuit Court of the State of Oregon for Douglas County *63 to Seattle-First National Bank in the amount of $12,500, in consideration of the assignment and transfer by such bank of its interest as mortgagee in the timber standing, lying, and being on the Timber Property. By stipulation of the parties under date of November 14, 1951, there was distributed and paid the sum of $11,083.34 to the bank in full payment of the assignment. On July 1, 1950, Eagle Timber was dissolved by operation of law for failure to pay its annual corporate license fees for a period of three years. Eagle Timber has had no legal corporate existence in the State of Washington since that date. On September 26, 1951, Herald delivered in escrow a deed executed by Eagle Timber to the Timber Property. This transaction was an attempt to sell the timber for $15,000 net. A title report by the Washington Title Insurance Company, which accompanied the deed, recited that title to the Timber Property was vested in the dissolved corporation. The broker who attempted to sell the Timber Property understood that he was dealing with a representative of the corporation. Herald entered into negotiations with the H & L Timber Company with reference to sale of the timber on the Timber *64 Property. On May 28, 1952, H. & L. Timber Company offered Herald $11,500 for the timber, but the sale was never closed. On August 12, 1952, Herald executed a bill of sale for the Sawmill located on the Timber Property in favor of J. A. Stafne, for $12,500. Stafne paid Herald with a note, secured by a mortgage on the Sawmill. Stafne intended to ship the Sawmill to the Philippine Islands in connection with a transaction with the Amer-Phil Lumber & Veneer Co., but it was agreed that it would not be shipped until the $12,500 purchase price had been paid. Stafne dismantled the Sawmill and shipped it to Seattle where it was stored awaiting shipment to the Philippines. Stafne never shipped the Sawmill to the Philippines, but subsequently went into business in Canada, and desired to use it in a corporation there. The security laws of British Columbia however required that the Sawmill be free and clear of all encumbrances when transferred to the Canadian corporation. Therefore Herald released his mortgage on the Sawmill and took in lieu thereof as security Stafne's stock in the Portland Canal Development Co., Ltd., the company to which Stafne was going to transfer the Sawmill. The value of *65 such stock was in excess of $12,500 at the time of the exchange. At the time of the hearing of this case, Stafne still owed Herald the full $12,500 sale price of the Sawmill. In November and December of 1952, Herald regotiated with one Ward for the sale of the timber on the Timber Property. Ward offered Herald $2,000 for the timber, which offer Herald tentatively accepted. Ward gave Herald a check for $500 on December 4, 1952, as earnest money which check Herald promised to hold until the spring. At that time Ward looked at the timber again and decided not to go forward with the purchase. Herald never cashed the $500 check. On their income tax return for 1952 the petitioners claimed a business bad debt loss of $33,639.84, as a result of Herald's alleged sale to Ward of the timber on the Timber Property for $2,000 and his alleged sale to Stafne of the Sawmill for $12,500. Their computation was shown as follows: Bad debt loss
Total loans to Eagle Timber and
Mill Company
$58,139.84
Less: Amount reimbursed
10,000.00
Balance due
$48,139.84
Less: Amount recovered through
foreclosure sale in 1952
14,500.00
Bad debt loss
$33,639.84
During the years from 1946 *66 to 1951 taxpayer advanced money to Eagle Timber and Mill Company. The Company went broke and during 1952 taxpayer recovered $14,500.00 through sale of the company's assets. In 1953 the petitioners wrote off the $2,000 that Herald failed to collect from Ward as a result of the alleged sale in 1952 of the timber on the Timber Property. Herald stopped paying taxes on the Timber Property in 1953. There was never filed in the office of the auditor of the county in which Eagle Timber had its registered office, an affidavit signed by a majority of the board of directors stating that the amount of paid-in capital with which it would commence business, as stated in the Articles of Incorporation, had been fully paid. Eagle Timber never filed any reports with the office of the auditor of the county in which it had its registered office or in the office of the Secretary of State, stating the total number of shares allotted and whether they had a par value or no par value, stating the consideration received for the shares allotted, or stating the valuation put upon the consideration other than cash received in payment of the shares allotted. There were never any meetings of the shareholders *67 of Eagle Timber held, as there were never any formal stockholders. No stock certificates were ever issued by Eagle Timber. Eagle Timber never filed with the auditor of the county in which it had its registered office any statement containing a list of all its directors and officers and their respective titles of office, names and addresses, and the term of office for which they had been chosen, as there were never any officers or directors formally elected. Eagle Timber never maintained any minute books or other books of records. The agreement of settlement between Herald and Phoebe, executed at the time of their divorce in 1951, did not make any specific reference to the interest of the marital community in Eagle Timber or its assets. However, the agreement provided, in paragraphs 11 and 12, as follows: "11. The wife does hereby assign, convey and transfer to the husband, all of her right, title and interest in and to all other life insurance policies heretofore issued upon the life of the husband, and his personal effects and office furniture and equipment and business accounts receivable. "12. The husband does hereby transfer, assign, convey, deed and release to the wife, *68 all of his right, title and interest in and to all other property and assets of every kind and character, real, personal or mixed and wheresoever situated." Herald was the attorney for the Lucky Music Company of America, a Nevada corporation (hereinafter referred to as Lucky Music). Lucky Music was engaged in the manufacture of machines which were combination slot machines and phonographs. The machines were designed in that manner so that they might be used in states where slot machines were illegal. During 1949, Ray Fezzler, Frank Magrini, and Leo Lamb, entered into an agreement to purchase 25 of the above mentioned machines for $12,500. Under the terms of the agreement the purchase price of $12,500 was to be paid to Herald as an escrow agent, and he in turn was to pay it over to Lucky Music as the machines were constructed. The machines were completed and Herald paid the escrow funds to Lucky Music. Fezzler, Magrini, and Lamb however did not want the machines delivered until after an election in Tacoma. Delivery was therefore delayed, and meantime Lucky Music's officers took the machines out of the area in an attempt to promote them elsewhere. The officers never returned with the *69 machines. Fezzler, Magrini, and Lamb then demanded that Herald refund the $12,500. On April 19, 1950, Herald executed an assignment of interest in a fund on deposit with the Circuit Court of the State of Oregon for Douglas County to a trustee of the above mentioned individuals in the amount of $12,500. The sum of money found to be distributable and payable to Herald was determined in the court proceeding on December 30, 1950; however, it was retained by the clerk of the court pending the determination, settlement, and adjudication of the rights of any assignees of such funds pursuant to assignments thereof by Herald. On November 21, 1951, pursuant to a stipulation of the parties, there was distributed and paid by order of the court, the sum of $11,083.34 in full payment and settlement of the assignment and the demands and claims against Herald, as escrow agent, of the $12,500. Herald never recovered any amount of the $12,500 from Lucky Music, either prior to November 21, 1951 or subsequent thereto. Eagle Timber was a separate taxable entity during the period October 22, 1946, through July 1, 1950. The transfers of the Timber Property and the Sawmill by Herald to Eagle Timber *70 constituted contributions to capital in that corporation. The loss sustained by Herald as a result of the transaction in which he acted as an escrow agent was personal in nature and was not incurred in his trade or business. The petitioners' failure to file a declaration of estimated tax for 1950 was not due to reasonable cause. Opinion The record in this case is confusing as the evidence falls short of establishing with clarity all of the facts necessary to understand fully the transactions which raise the questions we have been called upon to answer. We will do the best we can with the record on hand. As we see it, the petitioners make but two arguments - first, that in 1952 they sustained a loss from a transaction entered into for profit as a result of the alleged sale of the assets of Eagle Timber that year, and, second, that in 1951 they sustained a business loss as a result of a transaction in which Herald acted as an escrow agent. Insofar as the first argument is concerned, the petitioners contend that Herald, in addition to being an attorney, was actively engaged in other business enterprises, and in particular, mining, logging, and timber ventures, and that in 1946 *71 Herald entered into a business venture for profit in the form of Eagle Timber. The petitioners argue that although Eagle Timber was incorporated under the laws of the State of Washington, it was never really a corporate entity subject to taxation, since it did not comply with the laws of the State of Washington, i.e., Eagle Timber had no paid-in capital and no affidavit was ever filed by the board of directors stating that the paid-in capital had actually been paid; there were never any directors, officers, or stockholders; no directors or stockholders meetings were ever held; no reports as to shares issued were ever filed because there were never any shares issued; no books or records were ever kept; no annual license fees were ever paid subsequent to incorporation; and Eagle Timber never carried on any business as a corporation. Therefore, petitioners argue that Herald could not have made any capital investment in Eagle Timber, and his advances to Eagle Timber were in reality to his own business venture, so that subsequent losses were recognizable to Herald individually and not to Eagle Timber as a taxable entity. The petitioners argue further that the loss from the venture became *72 determinable in 1952 when Herald "sold" the timber to Ward for $2,000 and the Sawmill to Stafne for $12,500, and that no losses in respect to the Timber Property or the Sawmill had been sustained before that because of the continuous negotiations for sale of such property prior to 1952 which showed their potential large value. The petitioners' argument that Eagle Timber was never really a corporate entity for tax purposes is without merit. It does not follow from the fact that the corporation laws of the State of Washington were ignored subsequent to the filing of the Articles of Incorporation, that Eagle Timber had no corporate existence. A certificate of incorporation issued by the Secretary of State is conclusive evidence of the fact that the corporation has been incorporated. Rem. Rev. Stat. of Wash., [*] 3803-9 (1932). The penalty, if any, for Eagle Timber's failure to file reports, issue stock, elect directors, etc. is that the corporation shall be subject to a fine or that the corporation shall not enjoy limited liability. The corporation does not by these lapses lose its existence as a corporation. See American Radiator Co. v. Kinnear, 56 Wash. 210, 105 P. 630 (1909) *73 and Pierce County Dairymen's Ass'n v. Templin, 124 Wash. 567, 215 P. 352 (1923). Furthermore, under Washington law the right to question the legality of a corporation can be exercised only by the state. American Radiator Co. v. Kinnear, supra.
As a general rule, a corporation must be regarded as a separate taxable entity, though in certain exceptional circumstances the corporate entity may be disregarded as unreal or a sham. Moline Properties v. Commissioner, 319 U.S. 436 (1943). Where, however, a corporation engages in business activity subsequent to its incorporation, its entity will not be disregarded for tax purposes. National Investors Corporation v. Hoey, 144 Fed. (2d) 466 (C.A. 2, 1944). That stock was not issued, reports not filed, meetings not held, books not kept, etc. do not prevent a corporation from being a taxable entity. Langdon L. Skarda, 27 T.C. 137 (1956), on appeal C.A. 10. We think the formation of Eagle Timber was followed by business activity. Eagle Timber held title to the Sawmill and the Timber *74 Property and it engaged in certain security transactions respecting those assets. Eagle Timber was also a defendant in a proceeding before a Washington court on at least one occasion. This is sufficient business activity for regarding it as a separate taxable entity. Paymer v. Commissioner, 150 Fed. (2d) 334 (C.A. 2, 1945). The petitioners argue that the expenditures made by them in connection with Eagle Timber were not advances to the corporation, but were advances and payments in connection with a business venture. They rely on the fact that there was never any subscription to stock and that no stock was ever issued to Herald. This position is untenable. We think the Timber Property and the Sawmill, which were transferred to Eagle Timber, constituted contributions to its capital. Herald purchased the Timber Property, receiving a warranty deed executed in blank; he inserted Eagle Timber's name in the deed as the grantee. Herald also purchased the Sawmill and although there is no document in evidence showing a transfer of it to Eagle Timber, we think the record supports such a finding, since the mortgage executed by Eagle Timber in favor of Norris, which was signed *75 by Herald as president and Phoebe as secretary, stated that the mortgagor was the owner of the Sawmill, that the mortgagor had the right and authority to mortgage the Sawmill, and that the mortgagor would provide the mortgagee with all documents, proofs, and instruments governing title to such property which might be requested by the mortgagee. So far as we can tell from the record, unless these assets were contributions to capital, Eagle Timber was incorporated without any paid-in capital, which would be in violation of state law. Rem. Rev. Stat. of Wash. § 3803-8 (1932). We cannot presume that Eagle Timber violated the law. United States Bank v. Dandridge, 25 U.S. 64, 70 (1827). We think the Timber Property and the Sawmill, which were transferred to Eagle Timber by Herald, constituted contributions to its capital. Joseph B. Thomas, 2 T.C. 193 (1943). Our findings that Herald's investments in the Timber Property and the Sawmill were contributions to the capital of Eagle Timber rule out the alternative position taken by the petitioners on their 1952 tax return which was that a debt transaction occurred when Herald transferred assets to Eagle Timber, *76 and a business bad debt loss was sustained in 1952 when the alleged sales of such assets were made Nor did the petitioners sustain a capital loss in 1952 when the assets of Eagle Timber were allegedly sold. First of all, there is serious doubt as to whether there was a closed transaction for tax purposes in 1952, but even assuming there was, we would still be unable to allow the petitioners a capital loss since they have failed to establish their basis in the Eagle Timber assets. Eagle Timber was dissolved by operation of law on July 1, 1950, and at that time its assets, subject to liabilities, passed to its stockholders. Rem. Rev. Stat. of Wash. § 3836-15 (1932). Therefore, on July 1, 1950, Herald received a liquidating dividend, taxable to him at that time. B. F. Joel et al., 9 B.T.A. 1027 (1928). The amount so distributed to Herald must be treated by him as in full payment in exchange for his interest in Eagle Timber, section 115(c), Internal Revenue Code of 1939, and his gain or loss on the liquidation distribution, if any, is measured by the difference between the adjusted basis of his investment in the corporation and the fair market value of the property *77 distributed at the time of distribution. Section 111, Internal Revenue Code of 1939. Such fair market value becomes Herald's new adjusted basis in the property. But there is no evidence in the record to show what the fair market value of the Eagle Timber assets was at July 1, 1950 and thus the petitioners are unable to establish Herald's adjusted basis in the Eagle Timber assets at the time of the alleged sales in 1952. We are therefore unable to determine whether the petitioners realized a loss at that time. John J. Flynn, 35 B.T.A. 1064 (1937). We hold that the petitioners are not entitled to any kind of loss deduction in 1952 as a result of the alleged sales of the Timber Property and the Sawmill. As for the second issue, the petitioners contend they are entitled to a deduction for a loss incurred in a trade or business in 1951 as a result of a transaction in which Herald acted as an escrow agent. Herald's trade or business was that of an attorney. One of his clients was Lucky Music. When that company agreed in 1949 to sell 25 of its machines to Fezzler, Magrini and Lamb, Herald was named as an escrow agent to hold the purchase price of $12,500. Herald, as an *78 escrow agent, was acting for both parties to the transaction. He paid the escrow funds over to Lucky Music as the machines were built. The machines were completed, but delivery of them was delayed at the request of the purchasers, who were awaiting the outcome of an election in Tacoma. Meantime Lucky Music's officers absconded with the machines. Fezzler, Magrini and Lamb then demanded that Herald return the $12,500. Herald was unsuccessful in his attempts to recover the machines and to settle the matter he made an assignment in 1950 to Fezzler, Magrini and Lamb of his interest in a fund on deposit with an Oregon court, which court was in the process of determining his rights in that fund. In 1951 Fezzler, Magrini and Lamb received from the court, and by stipulation of the parties, $11,083.34 in full payment and settlement of their claims against Herald as escrow agent. The Commissioner contends that nothing occurred in 1951 to establish a loss that year and, alternatively, that any loss established was not shown to be of a business nature. We think the Commissioner must be sustained. Nowhere in the record does Herald admit that he might have breached his obligations as escrow agent *79 - in fact, his testimony is to the effect that he did not breach his obligations under the agreement. Herald's reasons for making the assignment to Fezzler, Magrini and Lamb, taken from his testimony, were as follows: "With all due respect to these men, they are well known in what is called 'the rackets.' I was given the heat, that they were going to have their money or else. So finally, to settle the matter, I signed them under date of April 19, 1950, a $12,500 note which was paid to them on November 21, 1951. * * *" It is clear, therefore, that Herald's motive for making the assignment was not to settle legal obligations resulting from his activities as an escrow agent or as an attorney, but was to protect himself from the threats of Fezzler, Magrini and Lamb. Herald was a lawyer in the year, in question and his payment of the amount involved under the circumstances described in his testimony does not in our opinion establish a loss in his trade or business. The loss was not proximately related or incidental to his trade or business, but was personal in nature and not deductible. The Commissioner conceded that the petitioners were not liable for an addition to tax, under section *80 294(d)(1)(A) for failure to file a declaration of estimated tax for 1951, and the petitioners contend that their failure to file a declaration of estimated tax for 1952 was due to reasonable cause and not to willful neglect and therefore they are not liable for the addition to tax made by the Commissioner under section 294(d)(1)(A), for 1952. The petitioners argue that in view of the involved litigation in which Herald was engaged and the substantial losses facing him, it was reasonable for him not to file a declaration of estimated tax. The petitioners' argument is without merit. The record clearly establishes that Herald should have filed a declaration of estimated tax for 1952, since his gross income from sources other than wages could reasonably be expected to exceed $100 for that taxable year and his gross income to be $600 or more. Section 58(a), I.R.C. 1939. There is no evidence in the record as to any "involved litigation" in which Herald was engaged in 1952, which would affect his filing a declaration of estimated tax and the only "substantial loss" facing Herald in 1952, so far as we can tell from the record, is that which might have arisen from the Eagle Timber venture *81 - yet Herald did not know that he would have a loss in 1952 from the sale of the assets of Eagle Timber until he sold them, and such alleged sale did not take place until the latter half of 1952, which was several months after his declaration of estimated tax was due. Section 58(d). We hold that the petitioners are liable for an addition to tax for 1952 for failure to file a declaration of estimated tax. The Commissioner also made additions to the tax for 1951 and 1952 under section 294(d)(2), I.R.C. 1939, for substantial underestimate of estimated tax. Section 294(d)(2) provides for an addition to tax in the event 80 per cent of the correct tax liability exceeds the estimated tax. The petitioners' argument on brief that they had reasonable grounds for reporting their income as they did and that therefore no penalty should be assessed with reference thereto, is irrelevant since reasonable cause is not a defense under section 294(d)(2). H. R. Smith, 20 T.C. 663 (1953). The petitioners' correct tax liability for 1951 and 1952 will be computed under Rule 50 in accordance with this *82 opinion, and at that time it can be determined to what extent the petitioners are liable for the addition to tax for substantial underestimate of estimated tax. Decision will be entered under Rule 50.