George C. Bettinger and Mary E. Bettinger v. Commissioner.
Bettinger v. Commissioner
Docket No. 5345-67.
United States Tax Court
T.C. Memo 1970-18; 1970 Tax Ct. Memo LEXIS 338; 29 T.C.M. (CCH) 52; T.C.M. (RIA) 70018; January 28, 1970, Filed. Richard C. Schiller, for the petitioners. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined the following deficiencies and additions to tax with respect to petitioners' income taxes for the years 1964 and 1965: Year
Deficiency
Addition to Tax§
6653(a) I.R.C. 1954
1964
$6,722.12
$336.11
1965
3,273.79
163.63
The sole issue for decision is whether petitioners are entitled to a deduction for partially worthless bad debts in the taxable years 1964 and 1965 in connection with advances to Boll Industries, Inc., in preceding years. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners George C. and Mary E. Bettinger are husband and wife. They were residents of San Gabriel, California, at the time of the filing of their petition in this case. Petitioners filed Federal *340 income tax returns on the basis of the calendar year for the years 1964 through 1967 with the district director of internal revenue, Los Angeles, California. Hereinafter George C. Bettinger will be referred to as petitioner. Petitioner was connected with a number of corporations as promoter, shareholder, creditor, or officer during the ten-year period preceding the taxable years in question. Flight Line Corporation (hereinafter referred to as Flight Line) was incorporated on August 25, 1955, for the purpose of engaging in the manufacture and distribution of aircraft seats and precision sheet metal assemblies. Petitioner was elected president and Warren E. Leary was elected vice president of the corporation. Of the 1,910 shares of stock outstanding on June 13, 1967, petitioner and his wife collectively owned 998 shares. Robert H. Feldman, for the respondent. Boll Industries, Inc., was incorporated in the State of California on May 13, 1960, by petitioner and four individuals: Robert F. Laabs, John H. Bell, Warren E. Leary, and Ernest E. Overgard. Its business consisted of the manufacture and sale of air diffusers and related equipment in the air conditioning industry. The organizers *341 of Boll planned to merge Boll eventually with Flight Line. The articles of incorporation of Boll authorized the issuance of 10,000 shares of common stock with a par value of $10 per share, but no stock was ever formally issued. Petitioner was elected president of Boll at the organizational meeting of its board of directors held on May 14, 1960. Petitioner received a salary of $200 per week during 1961 for management services rendered to Boll during that year. Thereafter, petitioner continued to serve the corporation, but Boll was unable to continue its salary payments to petitioner because of the lack of funds available for this purpose. In addition to the supervision of all aspects of production, petitioner rendered valuable accounting services to the corporation. Petitioner devoted all of his working time during the day to the affairs of Flight Line and Boll. Guardian Aire Corporation was organized in 1956 for the purpose of manufacturing electrostatic dust precipitators for the home building industry. Petitioner did not own any stock interest in Guardian Aire but served as director and rendered some management services to that corporation. Terri Air Conditioning Products, *342 Inc., was organized in 1956 for the purpose of manufacturing fire dampers for commercial air conditioning. Petitioner was elected to the board of directors of that corporation in 1964. He received a salary of $125 per month for management consultation. 53 The above-named corporations were financed primarily through capital contributions and cash advances from shareholders. Bank loans were usually difficult, if not impossible, to obtain. In some cases, where a corporation was in need of cash to continue its operations, it also resorted to invoice financing and the factoring of its accounts receivable. Boll received initially $25,000 from petitioner, plus $24,800 and $6,600, respectively, from two other individuals, John Bell and Warren Leary. These amounts were regarded by the individuals as contributions of capital to Boll, although there never occured any formal issuance of stock by such corporation. Petitioner advanced the following amounts to Boll between 1960 and 1967: Year
Advances
Repayments
Balance
1960
$ 4,412.00
0
$4,412.00
1961
31,588.00
-0-
36,000.00
1962
26,650.00
-0-
62,650.00
1963
17,902.83
$9,852.83
70,700.00
1964
27,100.00
1,700.002
96,100.00
1965
12,100.00
-0-
108,200.00
1966
3,516.55
-0-
111,716.55
1967
4,805.48
-0-
116,522.03
*343 Petitioner regarded the initial $25,000 of these payments as his contribution to the capital of that corporation. The balances of such advances were represented by written demand notes bearing interest at the rate of 10 percent per annum and were regarded as loans to the corporation. Additional advances in 1961, 1962, and 1963 amounting to approximately $6,000, $33,000 and $32,000, respectively, took the form of loans secured by accounts receivable, referred to as invoice financing, or the factoring of accounts receivable. Petitioner maintained extensive records of his transactions with Boll and other corporations. Bookkeeping activities of petitioner with respect to these transactions were carried on at night and on weekends at petitioner's home. Petitioner testified that the loans were made both to augment his income and aid the corporations in the continuation of their business operations. The "Receivables" account of petitioner's ledger reflects the following advances to Flight Line and repayments from 1957 through 1967: Year
Advances
Repayments
Balance
1957
$7,900.00
$355.19
$7,544.81
1958
44,200.00
10,044.81
41,700.00
1959
18,000.00
42,800.00
16,900.00 1960
16,900.00
1961
16,900.00
1962
26,500.00
21,000.00
5,500.00
1963
30,762.52
7,000.00
29,262.52
1964
77,250.00
21,100.00
85,412.52
1965
22,500.00
20,000.00
87,912.52
1966
32,897.54
120,810.06
1967
19,389.94
140,200.00
*344 As in the case of Boll, these advances were represented by written demand notes bearing interest at the rate of 10 percent per annum. In addition to these advances, petitioner paid a total of $99,877 into the capital stock account of Flight Line as consideration for the issuance to him of the stock of such corporation. [1] Petitioner's factoring activities and invoice financing relative to Flight Line were substantial, amounting to approximately $99,000 in 1961 and $30,000 in 1962. As in the case of Boll, such advances were not represented by notes. Petitioner's advances to Guardian Aire and repayments between 1964 and 1967 were as follows: Year
Advances
Repayments
Balance
1964
$5,100.00
$5,100.00
1965
130.00
5,230.00
1966
257.65
5,487.65
1967
125.00
5,612.65
These advances were represented to the extent of $5,000 by interest-bearing notes. Petitioner's practice of providing funds to small corporations began in 1949. The following amounts were advanced to corporations, *345 other than those set forth above, from 1949 through 1959: National
Norwegian
Total
Equipment
Smoking
Importers
Line
Food
Electronic
Fish
FlightNorwe
Aero
gian Fish
Factors
Importers
Year
MBH, Inc. Total
1949
$13,000.00
$13,000.00
1951
2,300.00
2,300.00
1954
15,727.85
$3,000.00
$100.00
$20,445.00
39,272.85
1955
5,314.90
900.00
3,300.00
9,514.90
1959
$14,000.00
14,000.00
Petitioner reported interest income from eight corporations in the 16-year period beginning with his taxable year 1951, as follows: 54 Flight
Terri
Guardian
Year
Boll
Line
Products
Aire
Total
1951
$223.57
$ 223.57
1952
515.08
515.08
1953
120.18
120.18
1954
162.69
$212.60
$ 60.00
435.29
1955
27.22
309.45
2,135.25
2,471.92
1956
261.70
99.70
903.50
1,264.90
1957
177.77
457.70
$69.73
705.20
Year
Boll
Flight Line
Terri
Guardian
Total
Products
Aire
1958
$ 1,205.27
$ 1,205.27
1959
6,161.77
6,161.77
1960
11,343.63
$810.21
12,153.84
1961
$1,962.38
1,962.38
1962
1,173.66
697.21
1,870.87
1963
1,150.00
3,029.68
600.00
4,779.68
1964
6,180.05
189.48
6,369.53
1965
1,688.93
11,886.04
375.00
13,949.97
1966
130.00
5,620.00
5,750.00
*346 Of the corporations enumerated above, petitioner had an equity interest in M.B.H., Inc., Norwegian Fish Importers, Flight Line, Boll, and Terri Products. In the case of Terri Products, petitioner acquired his interest after the loans were made. Petitioner also reported on his Federal income tax returns fees and salaries for services rendered to various corporations as follows: Year
Corporation
Amount
1960
Flight Line
$2,350.00
1961
Flight Line
125.00
1962
Terri Products
1,000.00
1963
Terri Products
1,800.00
1964
Terri Products
400.00
1965
Terri Products
1,000.00
Petitioner made several loans to individuals, usually business associates or employees of one of the aforementioned corporations, as follows: Debtor
Amount
Interest
Yr. of Loan
Leary
$1,900.00
4%
1958
Johnson
848.00
6%
1962
Dominquez
175.00
6%
1962
Eason
450.00
6%
1965
Boll's business activities were unsuccessful. As a result, Boll reported net losses for each year of its existence. The Federal income tax returns of Boll for the taxable years ending April 30, 1961, through April 30, 1967, disclose the following information with respect to *347 losses sustained in those years and excess of liabilities over assets at the end of each taxable year: Taxable
Excess of
Year Ending
Loss
Liabilities
Apr. 30
Reported
Over Assets
1961
$14,261.30
$ 14,261.30
1962
41,313.21
55,577.51
Taxable
Year
Excess of
Ending
Loss
Liabilities
Apr. 30
Reported
Over Assets
1963
$43,030.80
$ 98,608.31
1964
28,959.07
127,567.38
1965
36,987.30
164,564.68
1966
unknown
198,043.00
1967
31,558.00
231,853.00
Funds received by Boll and Flight Line from petitioner were required to help meet their operating expenses. Boll's financial position deteriorated rapidly after 1964. Even prior thereto, the possibility that petitioner would not recover his advances from Boll was substantial. Because Boll's liabilities greatly exceeded its assets, petitioner's expectation of repayment depended to a significant degree upon the success of Boll's business operations. Banks refused to extend any loans to either Boll or Flight Line after 1964 because these corporations were unable to provide security. After 1964 it became clear that Boll would never be profitable. Nevertheless, petitioner continued *348 to advance money to that corporation in order to keep its business alive so that Boll could be sold as a going concern. He believed that Boll was more valuable as a going concern. Petitioner did not receive security on his advances to Boll or Flight Line except in the case of his invoice financing. Where bank loans were available, petitioner subordinated his loans to those of the bank. Petitioner's efforts to sell Boll from 1963 to 1967 were fruitless. In 1967 the assets of Boll were sold at public auction to satisfy Federal tax liens, as a result of foreclosure proceedings instituted by the United States Government. 55 Flight Line began to show profits in 1958 after having sustained losses totalling $109,581 in the first three years of its existence. Its business operations continued to be profitable until 1963. Profits during this period reduced accumulated losses to zero by 1962. Flight Line's financial statement showed an excess of assets over liabilities during 1962 and 1963 of $16,860 and $25,361, respectively. However, after 1963 Flight Line suffered a severe decline in business resulting in deficit balances in its capital account for the years 1964 through 1967 as *349 follows: Year
Amount
1964
($ 47,416.00)
1965
( 55,849.00)
1966
( 271,151.00)
1967
( 366,909.00)
Petitioner did not charge off as worthless any of the advances to Boll or Flight Line on his books until 1967. Petitioner's advances to Boll became wholly worthless in that year. Petitioner has not established that any other losses have become wholly worthless during the taxable years in question. In their original Federal income tax returns for the years 1964 and 1965, petitioners claimed deductions of $40,100 and $35,900, respectively, for partially worthless nonbusiness bad debts attributable to loans to Boll in preceding years. Respondent disallowed such deductions in his notice of deficiency. Thereafter, petitioners amended their returns for the years 1964 and 1965, characterizing the losses in question as business bad debts and claiming deductions for the partial worthlessness of such debts in 1964 and 1965 of $40,100 and $35,900, respectively. [2]
Respondent has conceded *350 that petitioners are not liable for additions to tax under section 6653(a). Opinion Section 166(a) of the Internal Revenue Code of 1954[3] allows an ordinary deduction for the worthlessness of business bad debts. [4] Nonbusiness bad debts, however, are treated as short-term capital losses. See section 166(d). Thus, nonbusiness bad debts are neither deductible against ordinary income nor available as a net operating loss carryback to prior years. See sections 1212(b) and 172(d)(2). Moreover, while a deduction is allowed for partially worthless business bad debts, nonbusiness bad debts must become wholly worthless before they can be written off. See sections 165 and 166. *351 Petitioners seek to characterize the bad debts attributable to the advances to Boll as business bad debts. Accordingly, petitioners claim a deduction for the partial worthlessness of such debts in 1964 or 1965. Petitioners further claim that they are entitled to a net operating loss carryback from the years 1966 and 1967 to the extent that the advances in question became worthless in those years. The central issue in this controversy is the proper characterization of such advances as business or nonbusiness bad debts. Petitioners argue that the lending activities during the period in question, and prior thereto, constituted a trade or business and that advances to various corporations made in connection with that trade or business are therefore business bad debts. Respondent, on the other hand, classifies such advances as nonbusiness bad debts, based upon the assumption that the advances were not connected with a trade or business. Alternatively, respondent contends that the advances were, in fact, contributions to the capital structure of the corporations rather than debts and consequently must be treated as capital losses. Section 166(d)(2) defines the term "nonbusiness bad *352 debt" as a debt other than a debt created in connection with a trade or business of the taxpayer. To support his contention that the advances in question 56 constituted business bad debts, petitioner must establish that his advances were in fact debts, that he was engaged in a trade or business, and that the debts were proximately connected with such trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963); United States v. Henderson, 375 F. 2d 36 (C.A. 5, 1967). These are questions of fact in which no single factor is determinative. Section 1.166-5(b), Income Tax Regs., United States v. Henderson, supra. It is well settled that the trade or business of a corporation is not the business of its shareholder, no matter how great an interest in the corporation he possesses or how much time and energy he devotes to the affairs of such corporation. Whipple v. Commissioner, supra; Putnam v. Commissioner, 352 U.S. 82 (1956); Langdon L. Skarda, 27 T.C. 137, 148 (1956), affd. 250 F. 2d 429 (1957); Estate of Dominick F. Pachella, 37 T.C. 347 (1961), affd. per curiam 310 F. 2d 815 *353 (C.A. 3, 1962). Petitioner takes the position, however, that his activities in connection with the advances to various corporations between 1949 and 1967 amounted to a trade or business of lending money. We disagree. In our findings we have set forth the frequency and amounts of petitioner's advances to various corporations during this period. While we recognize that the advances in question were extensive and continuous, our conclusion rests upon the nature of the advances and the relationship between petitioner and the debtor corporations rather than upon the degree of financial activity involved. The advances which petitioner relies upon to support his position were made after 1960 principally to two corporations - Boll and Flight Line. As to each of these corporations petitioner took an active part in its organization and management and held substantial equity interests. Furthermore, petitioner relied heavily upon the success of these corporate ventures for the repayment of his advances. In addition, although Flight Line's capitalization was substantial, Boll appears to have been undercapitalized from the outset. While these circumstances are often considered to support the *354 characterization of advances as equity, they are also crucial to the determination of whether petitioner's advances can be regarded as a trade or business in the context of section 166. In order for the activities to qualify as a trade or business, they must result in "compensation other than the normal investor's return, income received directly for his own services rather than indirectly through corporate enterprise." Whipple v. Commissioner, supra, at 373 U.S. 203. Accordingly, where a taxpayer seeks to elevate his lending activity in connection with the financing of corporate ventures to the status of a trade or business, he must demonstrate that his activity was separate and distinct from the corporate enterprises so that the primary financial return is more than a mere return on his investments. The burden of proof on this issue is especially difficult to sustain where the taxpayer is closely related to the corporate enterprises as shareholder and managing officer, and where the corporations are in unsound financial shape, as in the case before us. The fact that petitioner may have been motivated by a desire to augment his income in making the advances, *355 a fact which petitioner emphasizes, does not alone establish the existence of a trade or business. To be sure, the expectation of profit is a key element in determining whether a taxpayer's activities constitute a trade or business. Hirsch v. Commissioner, 315 F. 2d 731 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; Lamont v. Commissioner, 339 F. 2d 377 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court. However, the anticipated source of such profit must be the independent business activity of the taxpayer rather than the corporate venture whose fruit the taxpayer hopes to harvest in the form of dividends or interest. In Higgins v. Commissioner, 312 U.S. 212 (1941), the taxpayer argued that his devotion of substantial time and energy to the management of his securities constituted a trade or business. The court concluded: The petitioner merely kept records and collected interest and dividends from his securities, through managerial attention for his investments. No matter how large the estate or how continuous or extended the work required may be, such facts are not sufficient as a matter of law to permit the courts *356 to reverse the decision of the Board. See also Whipple v. Commissioner, supra at 199. 57 Under the circumstances of the instant case, we think petitioner's anticipated return was plainly that of an investor, rather than the receipt of income from a separate and distinct trade or business. Petitioner, in making the advances in question, was motivated primarily by a desire to see the corporations succeed. At the time of these advances, Boll had been recently formed and was in a precarious financial position. The expectation of repayment was slight from the very outset. As time progressed, petitioner despaired of any possibility of repayment but continued to advance funds so that the corporation might be sold as a going concern. At best, all that can be said in the cases of Boll and Flight Line is that petitioner's expectation of repayment was dependent upon the future earnings of the corporation. The fact that such repayment was so closely tied up with the success of the corporation and that petitioner was intimately concerned with the corporate enterprise, brands petitioner's activities in respect of such corporations as an investment rather than a loan business. *357 In Holtz v. Commissioner 256 F. 2d 865 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court the Ninth Circuit observed: Petitioner here claims that his continued use of the corporate form coupled with the two hundred and fifty loan transactions in which he participated show conclusively that he was a promoter within these cases. What petitioner fails to recognize is the distinction between carrying on one's business through a corporate form, which, of course, requires some organizing and financing, and the business of dealing in corporations which may likewise require some financing arrangements. Where the former is the situation, it is hornbook law, and not contested by petitioner, that the corporate entity is the primary debtor and shareholder loans to protect his investment or increase its value do not create a separate business for the shareholders. The foregoing views of the Ninth Circuit are equally applicable to the instant case, although petitioner herein has urged that his promotional and financing activity constitutes a lending business rather than the business of promoting corporations. We note several additional circumstances which tend to negate *358 the existence of a trade or business of money lending. Petitioner devoted substantially all his working time during the day to the affairs of Boll and Flight Line. While it is possible for 18 T.C. 133 (1952); H. W. Findley, or business, the portion of a taxpayer's time occupied by a particular activity is a factor frequently considered in determining whether such activity constitutes a trade or business. United States v. Henderson, supra.Also, petitioner neglected to enforce many of his loans and although interest-bearing notes were executed which were payable on demand, such notes were never called. Moreover, the interest received, in most cases, amounted to only a small fraction of the interest provided for in those notes. In the case of Electronic Smoking, Inc., and Guardian Aire, petitioner received no interest. A comparison of the outstanding balances in the various accounts with the interest reported in that year reveals, in many cases, receipts of interest far below the percentage provided in the notes. For example, although the outstanding balance in the Boll account was at least $36,000 in 1962, petitioner reported no interest income in that year. *359 Similarly, in 1963 petitioner's receipt of $1,150 from Boll represented less than a 3 percent return on his investment of $62,650. For the year 1964 no interest income from Boll was reported although more than $70,000 remained outstanding. Also, in the case of Guardian Aire, no interest was ever received despite substantial advances to that corporation. While the corporations continued to accrue unpaid interest to petitioner, the eventual receipt of such amounts was highly doubtful and depended largely on future earnings. Another factor to be considered is the petitioner's continued advancement of funds in sizable amounts to many of the corporations after the weak financial condition of such corporations had become obvious. Petitioner testified in this regard that his continued advances to Boll were made for the purposes of sustaining its business operations so that Boll might be sold as a going concern. Such conduct is inconsistent with the existence of a trade or business of lending money. Finally, the refusal on the part of outside parties to extend loans to the debtor corporations during the period of petitioner's advances, while not decisive, suggests the absence of the businessman-like *360 manner essential to a determination that petitioner's money lending activities constituted a trade or business. Gross v. Commissioner, 401 F. 2d 600 (C.A. 9, 1968), affirming a Memorandum Opinion 58 of this Court; Henderson v. Commissioner, supra; H. Beale Rollins, 32 T.C. 604, 613 (1959), affd., 276 F. 2d 368 (C.A. 4, 1960). In view of our holding that the advances in question were nonbusiness in character, it is unnecessary for us to decide whether any part of the advances constituted equity or debt. We note, however, that notwithstanding the execution of interest-bearing notes, it is questionable whether a substantial portion of the advances were loans. While the contemporaneous written treatment by parties is an indication of their real intent as to the nature of such transactions, Gross v. Commissioner, supra, it is not decisive. Loans made to Boll and those made to Flight Line after 1964 bear many of the earmarks of equity, under the facts of this case. See Henderson v. Commissioner, supra; H. Beale Rollins, supra, and cases cited therein. Circumstances and considerations discussed earlier relating to the *361 existence of a trade or business are applicable here and do not bear repetition. In light of the foregoing, we conclude that losses which petitioner sustained in 1967 upon advances made in prior years are to be regarded as nonbusiness bad debts. Consequently, such losses must be treated as short-term capital losses in the year they became totally worthless. [5]
Decision will be entered under Rule 50. Footnotes
1. Payment of $16,900 for the stock of Flight Line took the form of a transfer of that amount from the notes payable account of Boll to its capital stock account in 1961.↩
2. Petitioners admit that their original characterization of the debts as nonbusiness bad debts would preclude a deduction for the partial worthlessness of such debts in 1964 and 1965.↩
3. All statutory references are to the Internal Revenue Code of 1954. Sec. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. ↩
4. The term "business bad debts" is intended to refer to those debts which are excluded from the definition of nonbusiness bad debts contained in sec. 166(d)(2), which section provides: (d) Nonbusiness Debts. - * * * (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
5. No deduction is permitted for partially worthless nonbusiness bad debts. Moreover, a charge-off in the year of deduction, or prior thereto, is indispensable to a deduction for partially worthless debts even in the case of business bad debts. See footnote 3, supra; sec. 1.166-3(a)(2)(i), (iii), Income Tax Regs.; International Proprietaries, Inc., 18 T.C. 133 (1952); H. W. Findley 25 T.C. 311 (1955), affd. per curiam 236 F. 2d 959↩ (C.A. 3, 1956). Petitioner has failed to charge off the claimed bad debts in any amount prior to 1967.