SAM C. and PATRICIA L. EVANS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Evans v. Commissioner
Docket No. 1807-72
United States Tax Court
T.C. Memo 1974-267; 1974 Tax Ct. Memo LEXIS 52; 33 T.C.M. (CCH) 1192; T.C.M. (RIA) 740267; October 15, 1974, Filed. *52 (1) In 1967 and 1968, petitioner incurred and paid certain expenses in the investigation, organization and operation of Venetian International, Inc. and as an employee of that corporation. Held, that petitioner is entitled to deductions under sec. 162 for certain employee business expenses and is entitled to capitalize part of the aforesaid expenditures as an increase to his cost basis in Venetian International, Inc. Held further, since the respondent stipulated the amounts claimed on petitioner's return, except for certain claimed automobile expenses for 1968 of which the mileage was adequately substantiated, an allocation will be made on the basis of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). (2) In 1969 petitioner made certain expenditures claimed to be employee business expenses. Held, that petitioner is not entitled to any deduction for said claimed expenditures since he has not shown to what trade or business the expenditures relate. (3) After purchasing the interest of his sister in certain real estate with a post-dated check, petitioner paid her $2,900, such payment not constituting the principal of the purchase price. Held, that the $2,900 payment was not shown *53 to be interest. (4) In 1967 petitioner received a loan from a bank which required a deed of trust on property used as security for the loan. In 1968 petitioner paid $3,000 to the trustee who held the deed of trust. Held, such payment was not interest but was part of the cost of obtaining a loan and must be capitalized and deducted over the life of the loan. (5) In 1967 petitioner became an employee of Venetian International, Inc. and, as a result of such employment, he moved his family and household goods from Atlanta to Dallas, the home office of that corporation. Held, that the petition in the instant case was sufficient to inform respondent that petitioner would claim a deduction under sec. 217. Held further, that petitioner is entitled to a deduction under sec. 217 for the cost of moving. (6) In 1967 and 1968 petitioner incurred and paid certain legal expenses. Held, deductibility determined. (7) In 1969 petitioner, as president of Sam C. Evans, Inc., purchased, obtained a loan for, leased and sold a jet aircraft. Sam C. Evans, Inc. was a duly organized corporation under the laws of the State of Texas. Held, that Sam C. Evans, Inc. was a viable corporation for federal *54 income tax purposes with the result that petitioner is not entitled to the interest, depreciation or loss relating to the loan, ownership or sale of the aircraft by Sam C. Evans, Inc. (8) In 1969 petitioner owned a farm on which he produced and sold hay. Held, that petitioner did not understate his reported hay sales for 1969. (9) In 1969 petitioner paid $49,844.95 to stop a dam on his farm from leaking. Held, the cost of these repairs was a capital expenditure. Wentworth T. Durant, for the petitioners. Robert M. Smith, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined deficiencies in petitioners' federal income taxes and additions thereto under section 6651(a), I.R.C. 1954, [1] as follows: Year
Deficiency
Addition to Tax 1967
$ 922.76
$4.29
1968
42,439.81
1969
213,204.80
Certain issues having either been conceded or not raised in the petition, the remaining issues presented for decision are: (1) Whether expenses relating to the seeking out, organization and operation of Venetian *55 International, Inc. paid in 1967 and 1968 by petitioner Sam C. Evans are business expenses deductions or whether such expenses can be capitalized as part of the basis of petitioner's stock in Venetian International, Inc.; and if so, whether certain automobile expenses included therein have been substantiated. (2) Whether certain expenses claimed on their 1969 return by petitioners as employee business expenses are deductible as such; and if so, whether certain of those expenses have been substantiated. (3) Whether $2,900 paid by petitioner Sam C. Evans to his sister, Jean Evans Dalton, in 1968 is deductible as interest. (4) Whether $3,000 paid in 1968 as a trustee's fee in connection with securing a loan is deductible as interest. (5) Whether the expense of moving family and household goods from Atlanta, Georgia to Dallas, Texas is a deductible moving expense. (6) Whether legal expenses of $7,068.78 paid in 1967 and $13,195.47 paid in 1968 are deductible. (7) Whether Sam C. Evans, Inc. was a viable corporation for federal income tax purposes and the owner of the Lear jet with the result that petitioner Sam C. Evans is not entitled, individually, to depreciation on the plane or *56 to a loss incurred on the sale thereof; and whether Sam C. Evans, Inc., rather than Sam C. Evans, individually, was indebted to Texas Western Financial Corporation with the result that interest paid to the latter corporation is not deductible by petitioner Sam C. Evans. (8) Whether petitioner Sam C. Evans understated his reported hay sales for 1969 by $5,301.17. (9) Whether the cost of repairing a dam in 1969 was an ordinary and necessary business expense.
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Sam C. Evans (hereinafter referred to as petitioner) and Patricia L. Evans are husband and wife who, at the time of the filing of the petition herein, maintained their legal residence in Denton, Texas. They filed their joint federal income tax return for the calendar year 1967 with the district director of internal revenue at Dallas, Texas, and for the years 1968 and 1969 with the district director of internal revenue at Austin, Texas. Issue 1. Expenses Relating to Venetian International, Inc. While in Miami, Florida in 1966, petitioner observed *57 some formed marble products which interested him. Petitioner discovered that these marble products were made in Atlanta, Georgia and he went to visit the manufacturing company in Atlanta where he learned that the leader in the field, Venetian Marble Company, was located in Dallas, Texas. Petitioner then visited the home office of Venetian Marble Company and spoke with the principals of the company about an association of a type whereby petitioner could market their products on a nationwide scale. After surveying the market for that company's products throughout the United States at his own expense in 1967, petitioner formed a corporation, Venetian Marble Sales, Inc. in April, 1967, to market and license others to manufacture Venetian Marble Company's products on a local basis. Venetian Marble Sales, Inc.'s initial contributed capital was $1,000 and its home office was in Dallas, Texas. Venetian Marble Sales, Inc.'s name was subsequently changed to Venetian International, Inc. (hereinafter the corporation will be referred to by the latter name). Starting in 1967 and until December 2, 1968, petitioner was employed as president of Venetian International, Inc. with an annual salary *58 of approximately $12,000 and was its principal salesman having sold more franchises than all other salesmen combined. Venetian International, Inc. employed other salesmen to sell franchises on a commission basis but none of these salesmen was reimbursed for expenses incurred in selling the franchises. The commission paid to the salesmen varied from between 5 to 20 percent of the selling price of a franchise package which ranged in cost from between $18,000 to $50,000. Petitioner was not reimbursed for any expenses incurred by him relating to Venetian International, Inc. Petitioner kept expense report sheets during 1967 and 1968 in which were enumerated the dates, places, amounts, nature and sometimes the general purpose of the expenses which he incurred and paid in those years.
On December 2, 1968, after giving some of his stock to his attorney and after selling 6 percent of his stock, petitioner exchanged all of his remaining Venetian International, Inc. stock for approximately 300,000 shares of Bonanza International, Inc. stock. Petitioner thereafter did not continue as an officer of Venetian International, Inc. On their 1967 return petitioners reported salary or wage income of *59 $8,000 and claimed a deduction for "UNREIMBURSED BUSINESS EXPENSES" in the amount of $9,784.83 as follows: Auto expense
$ 282.27
Tips and entertainment
2,711.81
Telephone
87.07
Postage
23.24
Air and railroad fares
170.65
Taxi fare
391.45
Meals
478.80
Lodging
1,412.95
Parking
96.00
Office expense
612.33
Salaries
3,440.00
Depreciation - Schedule below
78.26
$9,784.8[3]
DEPRECIATION Description
Date Acquired
Cost
Method
1967 Year Postage machine
6-1967
$ 91.10
10 Yr. SL
$ 4.06 (1/2)
Brief cases (2)
6-1967
205.16
3 Yrs. SL
34.20 (1/2)
Tape recorders (2)
5-1967
218.23
5 D.B.
40.00 (1/2)
$78.26
On their 1968 return petitioners reported salary or wage income of $9,000 and claimed a deduction for "EXPENSES INCURRED AS PRESIDENT OF VENETIAN INTERNATIONAL, VENETIAN MARBLE SALES, INC. AND RELATED COMPANIES" of which amount $23,390.44 was claimed as relating to Venetian International, Inc., as follows: Auto Expense
15,000 mi. x 10
$1,500.00
15,000 mi. x 7
1,050.00 $2,550.00
Commissions
6,225.00
Maintenance - office
37.00
Meals & Entertainment
6,575.28
Tips
539.75
Lodging
2,294.97
Transportation, Air, etc.
3,092.90
Taxis
119.00
Office Supplies
1,653.24
Parking
57.00
Advertising
17.55
Cleaning & Laundry
66.73
Auto Rental
112.02
Business Gifts
50.00
$23,390.44
Included in *60 the expenses claimed for 1968 was an automobile expense of $2,550 which deduction was based upon an estimated 30,000 miles driven for business purposes. In his notice of deficiency respondent determined that the aforementioned claimed deductions were not allowable. Respondent has since stipulated that all the claimed amounts, except that claimed for the automobile in 1968, were actually expended by petitioner. Issue 2. 1969 Employee Business Expenses During 1969 petitioner was one of the officers of Rolling International, Inc. and held a substantial block of that corporation's stock. Petitioner also participated in the organization of the corporation. Rolling International, Inc.'s business was the manufacture of mobile homes, the development of mobile home parks, and the distribution and sales of mobile home lots throughout the United States.
Petitioner kept expense report sheets during 1969 in which were enumerated the dates, places, amounts, nature and sometimes the general purpose of the expenses which he incurred and paid in that year. Petitioner reported no wages or salaries or other income from Rolling International, Inc. in 1969 nor did he report any income from any other *61 employment in that year. On their 1969 return petitioners claimed $37,378.36 as employee business expenses as follows: Auto Expense
15,000 mi. at 10
$1,500.00
15,000 mi. at 7
1,050.00 $ 2,550.00
Lodging
3,031.77
Transportation, Air, etc.
1,857.17
Taxis
632.06
Parking
383.42
Meals & Entertainment
11,708.47
Tips
364.35
Cleaning & Laundry
96.75
Office Supplies & Expense
1,119.25
Business Gifts
152.35
Employee Appreciation
414.72
Reports
190.00
Office Salaries
1,727.30
Office Rent
740.00
Travel
3,792.39
Telephone
389.71
Legal & Professional
3,778.48
Airplane Maintenance
67.52
Insurance
1,064.95
Advertising
170.62
Dues
563.09
Commissions
500.00
Home Used as Office-Sch.
421.99
Other Depreciation-Sch.
75.00
Salaries
1,587.00
Expenses Reimbursed
[9,165.07]
$ 28,213.29
USE OF HOME AS OFFICE
Cost of Home
$686,869.91
Depr. 25 yr. SL 1 Mo.
$ 2,289.56
Utilities
1,039.90
Telephone
890.43
Total
$ 4,219.89
10% Business Use
$421.99 OTHER DEPRECIATION
Cost
Rate
Method
1969 Depr.
Helipad
$3,000
10%
SL
$25.00
Office Furnishings
6,100
10%
SL
50.00
$75.00
This amount was reduced by a stated reimbursement of $9,165.07 which resulted in a claimed deduction for unreimbursed employee business expenses in the amount of $28,213.29. In his notice of deficiency respondent determined that such *62 claimed deduction was not allowable. Respondent has since stipulated that all the claimed amounts were actually expended by petitioner except for the following: $2,550 identified on the return as automobile expenses; $1,727.30 identified as office salaries; $1,587 identified as salaries; $190 identified as reports; $421.99 identified as home office expense (based on 10 percent use); $414.72 identified as employee appreciation; and $1,119.25 identified as office supplies and expense. Issue 3. $2,900 Payment to Jean Evans Dalton Petitioner and his six sisters each inherited a one-seventh undivided interest in some real property located in Jamestown, Tennessee from their mother in 1965. For several years petitioner and his sisters negotiated in trying to work out a division of this property. Several settlements were proposed but fell through.With the help of his sister Jean Evans Dalton, petitioner and his sisters came to an agreement whereby he would obtain an appraisal of the property and purchase his sisters' interest for the appraisal price. Petitioner did not have the funds to pay all six sisters in cash. Consequently, in January, 1967, petitioner acquired his six sisters' *63 interests in the property by giving cash to two of them who insisted on cash and by giving four post-dated checks dated January 23, 1968 in the amount of $12,850 each to his four other sisters of whom Jean Evans Dalton was one. While the post-dated checks were outstanding his four sisters who received them complained because the two who received cash were earning interest on their money while they were not. On July 18, 1968, petitioner sent a letter, with several checks enclosed, to his sister Jean Evans Dalton which reads, in pertinent part: Enclosed you will find a check in the amount of $2,900.00 to be used to pay your loan off at Union Bank; one in the amount of $360.00 to pay off Mom's hospital bill at Fentress County Hospital; and four checks, each in the amount of $1,000.00, payable to you, Kay, Shirl and Opal [the four sisters who received post-dated checks], for the inconvenience you have been caused. Later in July, 1968, petitioner conveyed part of the Jamestown property back to his four sisters in return for his post-dated checks. Petitioner's sister Jean Evans Dalton thought the $2,900 check, and possibly the $1,000 check, which she received from her brother were gifts *64 for her assisting petitioner in settling the disposition of the property located in Jamestown. On their 1968 return, petitioners claimed the payments made by the four $1,000 checks and the $2,900 check as interest expense. In his notice of deficiency respondent determined that the $2,900 payment was not an allowable deduction. Issue 4. $3,000 Trustee's Fee Soon after petitioner acquired his sisters' interests in the Jamestown property, he borrowed $60,000 from the Union Bank of Jamestown, Tennessee, giving the bank a trust deed on that property which it required as security. Petitioner repaid the loan of $60,000, interest of $4,500 and a trustee's fee of $3,000 on May 4, 1968. The $3,000 payment of the trustee's fee was made to the trustee named in the deed of trust which the bank required as security for the loan to petitioner. On their 1968 return, petitioners claimed a miscellaneous itemized deduction of $3,000 identified as "Trustees Fee - Union Bank, Knoxville, Tenn." [sic] In his notice of deficiency respondent determined that the trustee's fee was not allowable as an ordinary deduction. Respondent included the $3,000 payment in the cost basis of the Jamestown property, *65 part of which was sold in 1968. Issue 5.Moving Expenses Prior to his interest in marble products, petitioner and his family resided in Atlanta, Georgia. After investigating the marble products market and organizing Venetian International, Inc., petitioner moved to Dallas, Texas in April, 1967. Petitioner then moved his family and household goods to Dallas in the summer of 1967 at the cost of $1,140. Petitioner organized Venetian International, Inc. in April, 1967 (under the name of Venetian Marble Sales, Inc.) and was employed as its president. On their 1967 return, petitioners claimed $1,140 as a deduction for moving expense on Form 3903 entitled "Moving Expense Adjustment." In his notice of deficiency respondent disallowed the claimed moving expense deduction. In an amended petition to this Court, petitioner based his petition on this issue as follows: (a) The Commissioner erred in disallowing the amount of $1,140.00 of moving expense from Atlanta, Georgia to Dallas, Texas and $9,784.84 of employees' expense as an ordinary and necessary business expense or, in the alternative, in failing to capitalize these payments as additional cost basis in the acquisition of stock of Venetian *66 International, Inc. Issue 6. 1967 and 1968 Legal Expenses At some time prior to 1967, petitioner and others purchased the Du Mod Corporation in Miami, Florida from a Mr. Du Pont and a Mr. Gray. Du Mod Corporation was placed in bankruptcy in the latter part of 1966 or the first part of 1967 by Mr. Du Pont. In 1967 petitioner incurred and paid fees in the amount of $7,068.78 to the following persons: Paul Hyman, attorney - $125; Stone & Bozeman, attorneys - $443.78; William Frates, attorney - $5,000; and John Gunn, attorney - $1,500. Paul Hyman was the trustee in bankruptcy of Du Mod Corporation and the aforementioned $125 was paid to him for miscellaneous costs incurred. The aforementioned $443.78 paid to Stone & Bozeman was for legal assistance in the defense of a suit styled Hull and Beaty v. Evans filed against petitioner for money which the aforementioned plaintiffs lost as investors in Du Mod Corporation. Petitioner lost the suit. The aforementioned $5,000 paid to Frates was a retainer in connection with filing a law suit on behalf of petitioner, on the grounds of misrepresentation, against Du Pont and Gray relative to money petitioner lost as a result of his investing *67 in the Du Mod Corporation. This suit was unsuccessful. The aforementioned $1,500 paid to Gunn was compensation for representing petitioner's interest in the bankruptcy action relating to Du Mod Corporation. In 1968 petitioner incurred and paid $13,195.47, as evidenced by cancelled checks issued by petitioner, as follows: Item No.
Payee
Amount 1
Harold Stone
$ 528.79
2
Harold Stone
2,000.00
3
Harold Stone
2,000.00
4
Stone & Bozeman, Attorneys
975.64
5
Stone & Bozeman, Attorneys
1,650.28
6
Stone & Bozeman, Attorneys
823.13
7
Stone & Bozeman, Attorneys
491.37
8
Stone & Bozeman, Attorneys
1,603.41
9
Frates, Fay, Floyd & Pearson
622.85
10
Frates, Fay, Floyd & Pearson
1,000.00
11
Frates, Fay, Floyd & Pearson
1,500.00 Items 1, 4 and 6 were paid relative to the aforementioned lawsuit styled Hull and Beaty v. Evans. Item 5 relates to defense of allegations against petitioner based upon the Tennessee Blue Sky Law and also initiated by Hull. One thousand, two hundred and three dollars and fourty-one cents ($1,203.41) of Item 8 relates to the Hull and Beaty v. Evans lawsuit and the remaining $400 was paid for appraisal services provided by the Hop Bailey Company. Items 2 and 3 relate to defense of a criminal action styled *68 State of Tennessee, ex rel. v. Evans, filed against petitioner for alleged state security law violations resulting from an alleged sale of stock of Du Mod Corporation by petitioner to a Dr. Gene Cravens. Petitioner was successful in his defense of this suit. Item 7 relates to legal assistance provided petitioner in the sale of some Tennessee real property. Items 9, 10 and 11 relate to the aforementioned lawsuit filed by petitioner against Du Pont and Gray for money lost by him as a result of his investing in Du Mod Corporation. On their 1967 return, petitioners claimed a deduction of the aforenoted $7,068.78 as legal fees and, on the 1968 return, petitioner claimed a deduction of the aforenoted $13,195.47 as employee business expenses, identified further as legal expenses under the caption "Expenses Incurred as a Result of Former Employment - Du Mod Aircraft Co." Issue 7. Sam C. Evans, Inc. and Items Relating to the Lear Jet Because Rolling International, Inc.'s business was nationwide and required a great deal of air travel by its employees, petitioner and other officers of Rolling International, Inc. decided it should acquire use of an airplane. Although Rolling International, *69 Inc. was a publicly held company with a substantial market value, it could not arrange the financing necessary to purchase a jet aircraft. Petitioner, who personally had available lines of credit sufficient to acquire the aircraft, believed he could make a substantial profit if he acquired it and leased it to Rolling International, Inc. In March, 1969, petitioner executed a purchase order with Gates Aviation Corporation of Denver, Colorado for purchase of a Lear jet. This purchase order was signed on March 23, 1969 in the name of Sam C. Evans, Inc. by petitioner, who was identified on the order form as its president, although there was no corporation by that name in existence at that tiem. The total purchase price of the aircraft (exclusive of applicable taxes) was $874,748. When the order was placed, petitioner gave his personal check for $25,000 and a personal note for $50,000 as part of the purchase price. Petitioner executed a supplemental purchase order, dated June 17, 1969, in the name of Sam Evans, Inc. for modifications to the aircraft costing $5,939.75. This purchase order was also executed by petitioner as president. Articles of Incorporation for Sam C. Evans, Inc. *70 as a Texas corporation were executed and notorized on June 27, 1969. Petitioner, Alan D. Feld, and T. McCullough Strother were named therein as constituting Sam C. Evans, Inc.'s board of directors. A Certificate of Incorporation was issued to Sam C. Evans, Inc. by the State of Texas on June 30, 1969. Petitioner had discussed formation of a corporation under that name with attorneys in connection with obtaining a loan to finance the purchase of the aircraft because the bank making the loan could not charge an individual interest at the rate of 14 percent per year under Texas law. To finance the balance of the purchase price of the aircraft, petitioner executed a security agreement and a promissory note for $860,016 with interest at 91/2 percent per annum, dated June 27, 1969, in favor of the National Bank of Commerce of Dallas, Texas in the name of Sam C. Evans, Inc. The security agreement gave the bank a security interest in the aircraft. The proceeds of the loan were paid by the National Bank of Commerce with its cashier's check to Gates Aviation Corporation. 1a *71 On July 8, 1969, Texas Western Financial Corporation (hereinafter Texas Western) made a loan of $700,000 with interest at 14 percent per annum to Sam C. Evans, Inc. and the note given by Sam C. Evans, Inc. was signed by petitioner as its president. A chattel mortgage security agreement, dated July 8, 1969, which gave Texas Western a security interest in the Lear jet, was executed in favor of Texas Western in the name of Sam C. Evans, Inc. by petitioner as president of Sam C. Evans, Inc. The agreement recites in part that "Sam C. Evans, Inc. [is] a corporation duly organized under the laws of the State of Texas". This $700,000 loan from Texas Western was applied to the principal of the $860,016 note to the National Bank of Commerce on July 10, 1969. The National Bank of Commerce then issued a new note to Sam C. Evans Inc. for $160,016 with interest at 91/2 percent per annum, which petitioner later paid off personally, and assigned all of its *72 interest in the security agreement dated June 27, 1969 to Texas Western. At the time of the application for and the making of the $700,000 loan, petitioner and T. McCullough Strothers represented themselves to one of Texas Western employees as president and secretary, respectively, of Sam C. Evans, Inc. As additional collateral for the $700,000 loan, petitioner executed an individual guaranty, dated July 8, 1969, to secure the loan and gave Texas Western a security interest in 25,000 shares of common stock of Bonanza International, Inc. In this document signed by petitioner, it is stated that petitioner is financially interested in Sam C. Evans, Inc. and that Sam C. Evans, Inc. is a corporation duly organized, existing and in good standing under the laws of the State of Texas. Gates Aviation Corporation conveyed title to the Lear jet to Sam C. Evans, Inc. in a bill of sale dated June 27, 1969. Petitioner executed, under penalty of fine and/or imprisonment, an application dated June 27, 1968 [sic] for aircraft registration of the Lear jet with the Federal Aviation Administration which stated that Sam C. Evans, Inc., a corporation, was the owner of the aircraft. Petitioner signed *73 this application as president of Sam C. Evans, Inc. On July 1, 1969, a "Mr. Sam C. Evans, Inc." entered into a lease agreement with Management Jets International, Inc. (hereinafter MJI) in which the Lear jet in issue was leased to MJI. This lease agreement was executed on behalf of "Mr. Sam C. Evans, Inc." by petitioner. This lease agreement was conditioned upon an agreement between MJI and Rolling International, Inc. which was also entered into on July 1, 1969 and which provided that MJI would provide the Lear jet to Rolling International, Inc. for its use for a certain amount of time. In addition to providing flight time for Rolling International, Inc., MJI could use the aircraft in its regular charter business. MJI agreed to pay "Mr. Sam C. Evans, Inc." a certain amount per hour of the aircraft's use. MJI made two payments under the lease agreement in 1969. The first payment was by check dated August 27, 1969 in the amount of $9,810 and the payee was Sam C. Evans. The second payment was by check dated September 30, 1969 for the amount of $9,599.40 and the payee was Sam C. Evans, Inc. Each check was endorsed by petitioner and deposited to the account of Rolling International, *74 Inc. On August 19, 1969, petitioner paid Texas Western $5,988.91 interest on the $700,000 loan and on August 25, 1969, he paid $8,335 principal. On October 8, 1969, petitioner paid interest in the amount of $8,007.86 to Texas Western. On September 12, 1969 Rolling International, Inc. paid Texas Western interest in the amount of $8,416.23 and principal in the amount of $8,335 on the $700,000 loan. On November 19, 1969 petitioner executed a letter to MJI which he signed individually and as president of Sam C. Evans, Inc. in which it was stated that Sam C. Evans, Inc. was the owner of the Lear jet in issue, that such aircraft was leased to MJI by agreement dated July 1, 1969, that, under another agreement dated July 1, 1969, Rolling International, Inc. was indebted to MJI for the sum of $33,985.09, and that MJI was therein authorized to deliver the aircraft to Gates Aviation Corporation. The balance due on the $700,000 loan was paid by Gates Aviation Corporation in December, 1969. On December 16, 1970, Articles of Dissolution of Sam C. Evans, Inc. were filed wherein it was stated by the original incorporators, none of whom included petitioner, that no stock was issued, that no business *75 was commenced and that no subscriptions were ever received. On that same date a Certificate of Dissolution was issued by the State of Texas. No federal corporate income tax returns were ever filed on behalf of Sam C. Evans, Inc. On their 1969 return, petitioners included $24,759.09 as income received from rental of the Lear jet and deducted $96,769.80 as depreciation on the aircraft thus resulting in a claimed loss, exclusive of other rental income, from miscellaneous income sources of $72,010.71. Petitioners also deducted $44,806.40 as interest paid to Texas Western. On disposition of the aircraft, petitioners reported a loss of $90,828.45 as a sale of property other than a capital asset. In reaching the loss figure, petitioners reported a gross sales price of $683,330, a cost basis of $870,928.25 and depreciation taken of $96,769,80. In his notice of deficiency respondent determined that petitioners were not entitled to the claimed rental loss on the aircraft, the interest expense and the loss on the sale. Issue 8. Hay Income In 1967, petitioner purchased a farm in Denton County, Texas and in 1968 and 1969 he purchased additional acreage after which he owned between 800 *76 and 1,000 acres. Petitioner raised cattle and horses and grew alfalfa, oats, wheat and hay on this farm. Petitioner's bank account deposits for 1969 include $11,001.43 received from the sale of hay. Petitioner's accountant used the amount of such deposits in determining petitioner's income from the sale of hay and included this amount in farm income on the 1969 return. In his notice of deficiency, respondent determined that petitioner received $16,302.60 from hay sales in 1969 rather than the amount reported on the return.
Issue 9. Dam Repairs When petitioner purchased the farm in Denton County, Texas in 1967 there was a large cattle tank or lake created by an earthen dam. When petitioner acquired the farm there was no water seepage from the dam.
The dam was constructed between 1958 and 1960 and was 500 to 600 feet long with a height of approximately 40 feet. Both sides of the dam slope down towards the base of the dam which is approximately 100 feet wide. The soil used in construction of the dam was of a sandy, "gravelly" type which would not bond together. The dam consisted of approximately 30,000 cubic yards of soil. After petitioner acquired the farm, water began to seep through *77 the dam. After various attempts to stop the seepage, petitioners hired Billy Joe Wilson (hereinafter Wilson) to repair the dam in 1969. In order to repair the dam, Wilson cut a spillway to the base of the dam and allowed the lake to drain. Wilson then removed the front or waterside section of the dam along its entire length and stockpiled the removed soil. After the front section was removed, Wilson used 10,000 cubic yards of clay which formed a seam across the entire length of the dam from the waterline to the base and which replaced the 10,000 cubic yards of soil removed and stockpiled. Wilson compacted the clay in 12-inch lifts with sheep foot rollers and heavy equipment. Wilson used the stockpiled dirt, along with dirt obtained by excavation from the lakeside making the lake 1/4 to 1/2 acre longer, for shaping that part of the dam away from the water and that part above the waterline. After the work on the dam had been completed the general appearance of the dam remained as it was before the work was done. Afterwards the water seepage from the dam stopped. As a result of the repair the dam was in better condition and the possibility that the dam would break as a result of *78 the water seepage which carried off sediment was lessened. On their 1969 return, petitioners deducted the $49,844.95 cost of repairing the dam as a repair expense. In his notice of deficiency respondent determined that the claimed deduction for repairs to the dam was not allowable. OPINION At the outset we feel compelled to say that the record is not as clean as we would like it. In many instances the petitioner has not clearly delineated the expenses that relate to each particular issue or his justification for such expenditures that were delineated. Petitioner's testimony itself was on many occasions vague and on other occasions gave the impression of being rather adaptable to the needs of the issue. His testimony with respect to business expenses was so general in nature as to make a determination with respect to any particular item of expense most difficult, if not impossible. Issue 1. Expenses Relating to Venetian International, Inc. In April, 1967, after spending several months investigating the formed marble market, petitioner organized Venetian International, Inc. to market and to license others to manufacture marble products on a local basis. During the remaining *79 part of 1967 and until December 1, 1968, petitioner was employed as president of Venetian International, Inc. and one of his duties involved the sale of the franchises marketed by his company. During 1967 and 1968, petitioner spent certain amounts as a result of his investigation of the formed marble market and his organization of, employment by and ownership of Venetian International, Inc. Petitioner claimed all such expenditures as ordinary deductions resulting from his employment with Venetian International, Inc. and related companies on his 1967 and 1968 returns. Petitioner argues on brief that those expenditures relating to the investigation and organization of Venetian International, Inc. should be treated as contributions to the capital of Venetian International, Inc. and that the remaining expenditures are ordinary and necessary business expenses incurred by petitioner in selling franchises on a commission basis for Venetian International, Inc. Respondent, while admitting that all the claimed amounts except the 1968 automobile expenses were actually expended by petitioner, contends that the claimed expenditures were not expenses incurred in petitioner's trade or business *80 but, to the extent they relate to Venetian International, Inc., were expenditures by petitioner on behalf of Venetian International, Inc. and are to be treated as contributions to the capital of that corporation. It is well settled that expenses incurred in the mere search for or investigation of a business in which to invest are not ordinary and necessary business expenses of the person conducting such investigation since such search or investigation is not the engaging in business contemplated by section 162. [2] *81 Morton Frank, 20 T.C. 511 (1953); Dwight A. Ward, 20 T.C. 332, 343-44 (1953), affirmed on another issue, 224 F.2d 547 (9th Cir. 1955); George C. Westervelt, 8 T.C. 1248, 1254-55 (1947); cf. Harris W. Seed, 52 T.C. 880 (1969). However, since such sums are in the nature of organizational expenses of the corporation, they may be considered as contributions to capital and thus become a part of petitioner's cost basis in his Venetian International, Inc., stock. Dwight A. Ward, supra at 344. In 1967 and 1968, petitioner was in the trade or business of being an employee, here the chief corporate executive and salesman for Venetian International, Inc. David J. Primuth, 54 T.C. 374, 377-78 (1970) and cases cited therein. Cf. Trent v. Commissioner, 291 F.2d 669, 670-71 (2nd Cir. 1961), reversing 34 T.C. 910 (1960). To be deductible under section 162, the sums expended by petitioner must have been proximately related to the carrying on of his trade or business and not to the carrying on of the trade or business of Venetian International, Inc. Expenditures which petitioner personally made *82 on behalf of Venetian International, Inc. are not his ordinary and necessary expenses since the business of a corporation is separate and distinct from that of an employee-shareholder. Such expenditures are not deductible by petitioner but may constitute contributions to capital and hence an additional cost of petitioner's investment in Venetian International, Inc. to the extent they relate to that corporation. Jean U. Koree, 40 T.C. 961 (1963) and H. William Ihrig, 26 T.C. 73 (1956). The respondent's disallowance of the claimed deductions has the support of a presumption of correctness and the petitioner has the burden of showing that he is entitled to the deductions claimed. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. Petitioner's testimony concerning the relationship between the claimed deductions and his trade or business as an employee was vague and unconvincing. While petitioner did maintain expense report sheets which at times indicated the purpose of the expenditures, he did not introduce such sheets into evidence. Respondent did introduce a sampling of these sheets in an attempt to impeach petitioner's credibility. On *83 these sheets the purpose of the expenditures was identified by a word or phrase as relating to such things as "office salaries", "cleaning", meals at which topics such as "financing", "banking", "purchase of a company", "franchises", "plant facilities" were discussed, "refreshments-office", and "birthday gift for employee". We think it inconceivable that all of these expenses relate to petitioner's "trade or business" of being an employee. Rather we think a good part of them are expenditures made by petitioner on behalf of Venetian International, Inc. and, as such, are expenditures which enhance the value of petitioner's investment in the corporation. Moreover, we think this conclusion is buttressed by a comparison of the compensation of $8,000 and $9,000 reported on petitioner's 1967 and 1968 returns, respectively, and the business expenses of $9,784.83 and $23,390.44 claimed thereon. We do not doubt that, as Venetian International, Inc.'s chief executive and salesman, petitioner would ordinarily be expected to travel and entertain prospective customers and to incur other expenses contemplated by section 162, and we think he did so here without a right to reimbursement. But in *84 addition to meeting the requirements of section 162, petitioner must, at least for travel, entertainment and gift expenses, meet the additional substantiation requirements of section 274(d)[3] *85 . William F. Sanford, 50 T.C. 823, 826 (1968), affd. 412 F.2d 201 (2nd Cir. 1969), certiorari denied 396 U.S. 841 (1969). Since petitioner did not introduce into evidence his expense report sheets for the 2 years in issue, since his testimony was only very general and without detail except for his 1968 automobile expenses, for which we think the mileage was adequately substantiated by petitioner's and his accountant's testimony, and since no other supporting evidence was introduced, we do not think petitioner has properly substantiated his travel, entertainment and gift expenses under section 274(d). [4] *86 In addition, certain of the claimed expenses were shown on cross-examination not to relate at all either to petitioner's employment with or investment in Venetian International, Inc. Of the claimed deduction of $3,440 for salaries in 1967, $2,350 was shown upon cross-examination as not relating to Venetian International, Inc. and the remaining $1,090 was shown to have been paid on behalf of Venetian International, Inc. In addition, among the samples of petitioner's expense report sheets is an item described as "visit to Dr. Morgan - back & side pains" for $15 and "medicine" for $5.44 on April 6, 1968. We realize the evidence is scant with respect to an allocation of the claimed expenditures *87 between personal expenses, ordinary and necessary expenses of petitioner's trade or business which do not require substantiation under section 274(d) and contributions to the capital of Venetian International, Inc. However, since respondent has stipulated that the claimed expenditures were actually spent by petitioner and since we are satisfied that some of the claimed expenditures constitute allowable deductions and some others constitute additional investments in Venetian International, Inc., we will make a rough approximation of the allocation. Cohan v. Commissioner, 39 F.2d 540 (2nd Cir. 1930). Excluding personal or unrelated expenses and those ordinary and necessary expenses incurred in petitioner's employment which he has not substantiated under section 274(d), and bearing heavily against petitioner, we find that petitioner is entitled to a deduction under section 162 of $410.39 in 1967 and $1,090.40 in 1968 and contributions to capital of $2,040.99 in 1967 and of $7,999.52 in 1968.4a Cf. Henry Schwartz Corp., 60 T.C. 728, 744 (1973). a 1967
Sec. 162 expenses
Sec. 274(d) expenses
Contributions to capital of Venetian International Inc.
Personal or Unrelated Expenses Auto expense
$101.62
$ 152.43
$ 28.22
Tips and entertainment
2,711.81
Telephone
43.53
43.54
Postage
11.62
11.62
Air & Railroad fares
153.59
17.06
Taxi fare
140.80
211.20
39.45
Meals
430.92
47.88
Lodging
1,271.66
141.29
Parking
34.56
51.84
9.60
Office expense
612.33
Salaries
1,090.00
$2,350.00
Depreciation:
Postage Machine
4.06
Brief cases
34.20
Tape recorders
40.00
$410.39
$4,983.45
$2,040.99
$2,350.00
*88 b 1968
Sec. 162 expenses
Sec. 274(d) expenses
Contributions to capital of Venetian International Inc. Auto expense
$1,020.00
$1,530.00
Commissions
$6,225.00
Maintenance Office
37.00
Meals & Entertainment
6,575.28
Tips
539.75
Lodging
2,294.97
Transportation, Air, etc.
3,092.90
Taxis
47.60
71.40
Office Supplies
1,653.24
Parking
22.80
34.20
Advertising
17.55
Cleaning & Laundry
66.73
Auto Rental
112.02
Business Gifts
50.00
$1,090.40
$14,300.52
$7,999.52 petitioner was no longer an employee of Venetian International, Inc. but was then employed as an officer of Rolling International, Inc. In light of petitioner's vague testimony concerning the relationship of the expenditures to any trade or business, the lack of explanation or detail as to the substantiation requirements of section 274 and the logical conclusion that part of an employee's (as opposed to his employer's) business expenses was not normally thought to include such items as "office supplies", "office rent", "advertising", "commissions" and "salaries", we hold that petitioner has not carried his burden of proof on this issue. Issue 3. $2,900 Payment to Jean Evans Dalton Petitioner contends that a payment of $2,900 to Jean Evans Dalton was compensation to her *89 for holding his post-dated check for $12,850 from January, 1967 to July, 1968. Respondent allowed petitioner a deduction of $4,000 as interest paid to his four sisters ($1,000 to each sister including Jean Evans Dalton) on the four post-dated checks for $12,850 each which were held the same amount of time by each of his four sisters. It is respondent's position that the additional payment to Jean Evans Dalton does not constitute interest, and we agree.
Section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." To constitute interest the payment must be for the use or forbearance of money or the amount which one has contracted for the use of borrowed money. Deputy v. du Pont, 308 U.S. 488, 498 (1940); Norman Titcher, 57 T.C. 315, 322 (1971). Petitioner bears the burden of proving that the payment in issue constituted interest on indebtedness within the meaning of section 163, James A. Collins, 54 T.C. 1656, 1661 (1970), and this he has not done. On cross-examination, petitioner was asked to state the amount of the obligation to which the interest related and his reply was: Well, I am not sure. It may *90 have been a million dollars. It may not be interest. It may be something else. Petitioner's sister Jean Evans Dalton thought the $2,900 payment was a gift for her aiding her brother in the purchase of certain inherited property. In the letter in which the $2,900 check was enclosed it is stated that the check was to be used to pay off Jean Evans Dalton's loan at a bank while the same letter stated that the four $1,000 checks were for the inconvenience caused to the four sisters. It would be illogical to conclude that one sister would receive $3,900 interest and the other three $1,000 each for holding post-dated checks for the same amounts for the same time. On brief petitioner contends, alternatively, that the $2,900 was compensation paid by him for use of another's collateral to secure a loan for use in his trade or business with the result that the payment is deductible as an ordinary and necessary business expense.Petitioner relies upon M. A. Long, 8 B.T.A. 737 (1927). The short answer to this contention is that petitioner has not shown to what trade or business of his this transaction relates. Issue 4. $3,000 Trustee's Fee
Soon after petitioner acquired his sisters' interests *91 in the Jamestown property in 1967, he borrowed $60,000 from a bank giving the bank a trust deed on the property which it required as security. In May, 1968, petitioner repaid the loan along with interest of $4,500 and a trustee's fee of $3,000.
Petitioner contends that the trustee performed no real services and that the fee was a part of the overall cost of securing the loan and should be deductible as interest.Respondent, on the other hand, contends that the $3,000 is not interest and has allowed the cost basis of the Jamestown property to be increased by $3,000.
Generally, the cost of obtaining a loan or mortgage, other than the interest expense itself, is capital in nature and hence that cost must be capitalized and deducted over the life of the loan. Detroit Consolidated Theatres v. Commissioner, 133 F.2d 200 (6th Cir. 1942), affirming per curiam a Memorandum Opinion of the Board of Tax Appeals; Herbert Enoch, 57 T.C. 781, 794-95 (1972), and cases cited therein. Petitioner has not convinced us that the trustee's fee was other than compensation for services rendered in obtaining the loan. However, respondent is also incorrect in adding the fee to the basis of the Jamestown property. *92 The fee should be deducted over the life of the loan and if such life ends early the unamortized portion is then fully deductible. Herbert Enoch, supra.
Issue 5. Moving Expense Prior to his interest in marble products petitioner and his family resided in Atlanta, Georgia. In April, 1967, petitioner became an employee of the newly organized Venetian International, Inc. in its home office located in Dallas, Texas and in the summer of 1967 moved his family to Dallas. The cost of moving totaled $1,140. On their 1967 return, petitioners claimed $1,140 as a deduction for moving expense on Form 3903 entitled "Moving Expense Adjustment." Respondent contends first that the employment of section 217 by petitioner on brief as support for the deductibility of this expense raised a new theory or issue which prevents our considering that section as a rationale for allowing the deduction since it was not properly pleaded. See Estate of Akos Anthony Horvath, 59 T.C. 551 (1973).In their petition to the Court, petitioners described the error in the Commissioner's determination as involving "moving expense." Among the facts upon which petitioner relies in his petition is the statement "During the *93 year 1967 Petitioners incurred and paid $1,140.00 of expenses for moving to Dallas, Texas from Atlanta, Georgia." The caption to section 217 reads "SEC. 217. MOVING EXPENSES." We think respondent was fairly and adequately informed of the possibility of the use of section 217 as a basis for the allowance of the deduction. We perceive little difference between the petition as drafted and those deficiency notices of respondent phrased in broad or ambiguous language. See Big "D" Development Corp. v. Commissioner, 453 F.2d 1365 (5th Cir. 1972), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 406 U.S. 945 (1972); Mills v. Commissioner, 399 F.2d 744, 748 (4th Cir. 1968), affirming a Memorandum Opinion of this Court; Manuel D. Mayerson, 47 T.C. 340, 348-49 (1966); Arthur Sorin, 29 T.C. 959, 968-71 (1958), affirmed per curiam 271 F.2d 741 (2nd Cir. 1959). As to the substantive issue, after conceding that petitioner actually expended the claimed $1,140 respondent argues only that petitioner has not shown that that amount was not reimbursed by his employer. Since respondent does not contest the fact that petitioner has shown he incurred and paid $1,140 in moving *94 his family from Atlanta to Dallas in connection with his employment, we think that respondent is picking at straws on this issue and that petitioner is not, in this case, required to make a further affirmative statement that he was not reimbursed for the cost of moving. Considering the fact that Venetian International, Inc.'s policy was not to reimburse its employees for expenses incurred in selling its franchises, we think it doubtful that petitioner was reimbursed for his moving expenses. Issue 6. 1967 and 1968 Legal Expenses In 1967 and 1968 petitioner paid the following fees: Category, Year and Payee
Amount (1) Du Pont and Gray lawsuit
1967 - William Frates
$ 5,000.00
1968 - Frates, Fay, Floyd & Pearson
622.85
Frates, Fay, Floyd & Pearson
1,000.00
Frates, Fay, Floyd & Pearson
1,500.00
(2) Hull and Beaty v. Evans
1967 - Stone & Bozeman
443.78
1968 - Harold Stone
528.79
Stone & Bozeman
975.64
Stone & Bozeman
1,650.28
Stone & Bozeman
823.13
Stone & Bozeman
1,203.41
(3) State of Tennessee ex. rel. v. Evans
1968 - Harold Stone
2,000.00
Harold Stone
2,000.00
(4) Du Mod Corporation bankruptcy
1967 - Paul Hyman
125.00
John Gunn
1,500.00
(5) Sale of Tennessee property
1968 - Stone & Bozeman
491.37
(6) Hop Bailey Company appraisal Sale of Tennessee property
1968 - Stone service
1968 - Stone & Bozeman
400.00
*95 It is well settled that "costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures." Woodward v. Commissioner, 397 U.S. 572, 575 (1970). In determining the nature of the claimed litigation expenses we will inquire whether the origin of the claim litigated is in the process of acquisition or disposition itself. Woodward v. Commissioner, supra at 577; Helgerson v. United States, 426 F.2d 1293 (8th Cir. 1970); Stass Reed, 55 T.C. 32 (1970). As for category (1) of the claimed expenses, petitioner contends on brief that he sued Du Pont and Gray for lost profits which he expected to receive from the Du Mod Corporation and that the expenses are thus deductible, under section 212. [5] However, he presented no evidence to prove this assertion and we have found as a fact that the suit was for the loss of funds invested in Du Mod Corporation rather than for lost profits. We know that this suit was based upon the grounds of misrepresentation by Du Pont and Gray but we were not informed with respect to what was misrepresented since neither the complaint nor the decision in that case was introduced into the record. We are not permitted to speculate *96 in this matter but must decide the case upon the meager facts presented. The burden of proof being on petitioner, we will assume that all necessary facts not presented are unfavorable to him. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir., 1947). Thus, we assume that the misrepresentation upon which the complaint was based in the suit against Du Pont and Gray occurred during the acquisition of the Du Mod Corporation and that petitioner sought damages or a reduction in or return of the selling price. As such, we conclude that the claim giving rise to the litigation expenses arose in the process of acquisition and that these expenses are thus capital expenditures and not deductible under section 212. As for the legal expenses of category (2) relating to the action styled Hull and Beaty v. Evans *97 we are again at a loss because of the lack of evidence concerning the theory of that suit. In that action two of the investors in the Du Mod Corporation successfully sued petitioner for money they lost in the venture. He was also sued for alleged violation of the Tennessee Blue Sky law. In his amended petition, petitioner claimed such expenses were ordinary and necessary business expenses. However, on brief he contends these expenses were losses incurred in a transaction entered into for profit under section 165(c) (2), a theory which is quite different from that asserted in the amended petition. Unfortunately, we do not know whether the suits arose out of petitioner's action as an employee of Du Mod Corporation or as an individual investor. We do not even know if the suits arose because petitioner sold stock to Hull and Beaty. Consequently, we have no basis upon which to determine the nature of the legal expenses incurred in the defense of those suits and we hold that petitioner is not entitled to a deduction for any of the expenses in category (2). The expenses of category (3) relate to a criminal proceeding styled State of Tennessee ex. rel. v. Evans involving state security *98 law violations apparently arising out of a complaint by a Dr. Gene Cravens who invested in Du Mod Corporation. Petitioner was successful in his defense of this prosecution. In considering the deductibility of this expense, we do not know whether petitioner sold stock as an officer of Du Mod Corporation, as a securities dealer or as an individual investor. At trial, petitioner's actions giving rise to this prosecution were not described with any degree of particularity.Consequently we conclude that these expenses arose as a result of the sale of a capital asset and must be considered capital expenditures. The items in category (4) involve expenses of a stockholder seeking to recover his investment in a bankrupt corporation. Such expenses have not been shown to relate to any trade or business of petitioner nor should they be considered section 212 expenses since they relate only to the recovery of petitioner's capital investment in Du Mod Corporation. Consequently we think they should be considered capital expenditures. The expense listed in category (5) relates to legal assistance petitioner received in the sale of some Tennessee real property in 1968. The identity of that property *99 was not specified. However, based upon certain letters from the attorneys rendering those services which describe the services, we conclude that this payment relates to the sale of part of the Jamestown property petitioner received from his sisters. This was the only sale of Tennessee real property listed on petitioner's 1968 return. Consequently this expense should reduce the amount of gain reported on that sale. As for the expense listed in category (6), we know that it was incurred for appraisal services, but we were not informed as to what was appraised. Since we do not know whether the property appraised was business, investment or personal in nature, we cannot allow a deduction for this expense. Issue 7. Sam C. Evans, Inc. and Items Relating to the Lear Jet The principal question to be resolved in this issue is whether Sam C. Evans, Inc. is to be accorded recognition as a viable corporation for federal income tax purposes or whether petitioner was conducting business as a sole proprietorship when purchasing, leasing and selling a Lear jet in the name of Sam C. Evans, Inc. Petitioner contends that he purchased the aircraft individually by using the fictitious name "Sam *100 C. Evans, Inc.", that he never formed a corporation by that name, that he did not see the Articles of Incorporation of Sam C. Evans, Inc. until shortly before the trial of this case and that, nevertheless, the corporation so formed was not duly authorized under the laws of the State of Texas to commence business and did not in fact carry on business.Petitioner then concludes that the purchase, operation and sale of the aircraft was part of his own individual business, which conclusion would entitle him to deductions for the interest, depreciation and a loss incurred in connection with the purchase, operation and sale of the aircraft. Respondent, on the other hand, contends that the aircraft was purchased, leased and sold by Sam C. Evans, Inc., rather than by petitioner, and that petitioner cannot, at this late date, disavow the existence of that corporation and thereby claim the aforementioned deductions individually. In cases of this sort, the rule is that corporate entities generally will be recognized rather than disregarded for federal tax purposes and only in exceptional situations will courts ignore the separate existence of a corporation. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 439 (1943); *101 New Colonial Ice Co. v. Helvering, 292 U.S. 435, 442 (1934). In order to be a viable business entity for federal tax purposes, a corporation must have been formed for a substantial business purpose or actually engage in substantive business activity. In Moline Properties, Inc. v. Commissioner, supra at 438-39, where the taxpayer attempted to have the corporate existence ignored, the court stated: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation 2 or to avoid 3 or to comply with 4 the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [Footnotes omitted.] [Emphasis added.] See also National Investors Corp. v. Hoey, 144 F.2d 466, 467-68 (2nd Cir. 1944). As long as the corporation serves a valid business purpose or engages in business (i.e., is not a sham), its separate existence will not be ignored even though a shareholder owns all or a majority of the corporation's *102 stock and is in complete control of the corporation's affairs. National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949); Ernest L. Rink, 51 T.C. 746, 752 (1969). The degree of business activity necessary for recognition as a viable corporate entity for tax purposes is not great. Britt v. United States, 431 F.2d 227, 237 (5th Cir. 1970); Ernest L. Rink, supra at 752. Upon issuance of its Certificate of Incorporation on June 30, 1969, Sam C. Evans, Inc.'s existence as a corporate body began under Texas law and the Certificate of Incorporation itself was conclusive evidence under Texas law, except against the State, that all conditions precedent to its existence were complied with. Tex. Bus. Corp. Act. art. 3.04 A (1956). Petitioner argues, however, that under Tex. Bus. Corp. Act art. 3.05 A (Cum. Supp. 1974) Sam C. Evans, Inc. was not authorized to commence business since, as required by that statute, it had not received consideration of the value of $1,000 in return for issuance of its shares. However, such requirement is only a condition subsequent. While the noncompliance therewith may give rise to an action by the State to forfeit the franchise, in the absence of any such *103 action such noncompliance does not affect the legal existence of the corporation. Skarda v. Commissioner, 250 F.2d 429, 435 (10th Cir. 1957), affirming 27 T.C. 137 (1956). Furthermore, since title to the aircraft was validly registered in the name of Sam C. Evans, Inc. and since the value of the plane is clearly more than $1,000, we cannot agree with petitioner that there was no paid-in capital even though there was no stock issued therefor. Fleming G. Railey, 36 B.T.A. 543, 548 (1937). Where, as here, the conditions precedent to the creation of a corporate body have been complied with under state law, the corporate entity will not be disregarded even though no stockholders' or directors' meetings were held, no officers or directors were elected, no minutes were kept and no stock was issued. Langdon L. Skarda, supra at 27 T.C. 144-45. After carefully considering the entire record we think Sam C. Evans, Inc. should be recognized as a viable and separate corporate entity for tax purposes on the basis of the test outlined in Moline Properties, Inc. v. Commissioner, supra. Petitioner wished to purchase an aircraft to be used by Rolling International, Inc. Petitioner had the personal *104 resources necessary to borrow the funds to purchase the aircraft, but the financing institution (Texas Western) which provided permanent financing wanted to receive interest at 14 percent per annum. Since under Texas law, only a corporation could be charged interest at that rate, petitioner and his attorneys discussed formation of a corporation to which the loan could be made. Such a corporation was formed, although not personally done so by petitioner but we assume by his attorneys on his behalf. This, we think, is a valid business purpose for formation of a corporation. In addition to formation of the corporation for a valid business reason, substantial business activities were conducted by and in the name of Sam C. Evans, Inc.As noted in our findings of fact, loans were made to Sam C. Evans, Inc., the aircraft was registered to Sam C. Evans, Inc., a lease with MJI was entered into by Sam C. Evans, Inc. under the misnomer "Mr. Sam C. Evans, Inc." and one of the two payments under the lease was made to Sam C. Evans, Inc., and the aircraft was sold by Sam C. Evans, Inc. Petitioner testified that he never formed Sam C. Evans, Inc. and did not see its Articles of Incorporation until *105 shortly before trial. The apparent inference petitioner wishes us to draw from his testimony is that he did not know of the corporation's existence and thus did not conduct business on its behalf. Rather petitioner contends that he used the "fictitious" name Sam C. Evans, Inc. to conduct his personal affairs. This conclusion we are not willing to reach. Petitioner was much too sophisticated a businessman to be unaware of the significance of the abbreviation "Inc." We realize that petitioner was not one of the three people who signed the Articles of Incorporation or the Articles of Dissolution of Sam C. Evans, Inc. However, that fact and petitioner's self-serving testimony alone do not convince us that petitioner was conducting business on his own behalf rather than on behalf of the corporation Sam C. Evans, Inc. Among the facts and circumstances which convince us otherwise are the following: petitioner discussed the creation of a corporation with his attorneys in order that the bank giving the loan for the purchase of the aircraft might charge interest at the rate of 14 percent per annum, which rate would be usurious if charged to an individual; petitioner (and even his attorney *106 T. McCullough Strothers) held Sam C. Evans, Inc. out as a corporation on all occasions, at times under penalty of fine and/or imprisonment, to those with whom he dealt; a bill from attorneys addressed to Sam C. Evans, Inc. dated August 5, 1969 at the address used by petitioner in connection with Sam C. Evans, Inc. for, among other items, "Articles of Incorporation (previously billed)"; and the following statements in petitioner's original petition and his amended petition: "Petitioner Evans admits that he applied for a corporate charter for the purpose of purchasing and holding such plane but said corporation never reached valid existence * * *" and "Several days before delivery of the plane, Petitioner concluded it would be prudent to cause title to the plane to be issued in the name of a corporate nominee to avoid personal, tort liability." While it may have seemed in petitioner's mind that the purchase, leasing and sale of the aircraft were being carried on as if no corporation existed, we cannot ignore the documentary evidence as found in our findings of fact in favor of petitioner's self-serving testimony. While the business of Sam C. Evans, Inc. was conducted by petitioner in *107 a free-lance way, petitioner's objective actions held Sam C. Evans, Inc. out as a valid corporation. We do not think his payment of certain obligations of Sam C. Evans, Inc. by personal check requires a different result. We think the present issue is a close one but do not find that petitioner has carried his burden of convincing us that Sam C. Evans, Inc. was not a viable corporation. Since the loans by the National Bank of Commerce and by Texas Western were made to Sam C. Evans, Inc., rather than to petitioner who was at most only a guarantor, and since Sam C. Evans, Inc. was the registered owner of the aircraft, petitioner is not entitled to the interest, depreciation or loss claimed in connection with the aircraft. Issue 8. Hay Income As part of the operation of his Denton County farm in 1969, petitioner grew and sold hay. On their 1969 income tax return petitioners reported hay sales totaling $11,001.43. Petitioner determined the amount of such income by totaling his bank deposits for 1969 received from the sale of hay. Petitioner's accountant presented an analysis of hay sales income based on petitioner's deposits. Petitioner also testified that he reported all income *108 from his crop operations on his 1969 return. In his notice of deficiency, respondent determined that petitioner's hay income for 1969 was understated by $5,301.17. However, respondent has not stated either in the notice of deficiency or at trial the basis for his determination that petitioner received this additional income and relies only on Welch v. Helvering, 290 U.S. 111 (1933), for the proposition that the burden is on petitioner to prove respondent's determination erroneous. As a result of the evidence offered by petitioner, we think petitioner has overcome the presumption of correctness attached to respondent's determination. Since no evidence on this issue was offered by respondent we hold petitioner correctly reported his income from hay sales in 1969. Issue 9. Dam Repairs In 1969 petitioner spent $49,844.95 to stop a dam on his Denton County farm from leaking. Petitioner contends that this expenditure gives rise to a deduction as an ordinary and necessary business expense for repairs under section 162. Respondent contends that the cost of the work done on the dam is a capital expenditure which may be treated as an expense which is not chargeable to capital account *109 and deducted as directed by sections 263 and 175. [6] *110 *111 However, such deduction is limited to 25 percent of the gross income derived from farming during that taxable year. Respondent asserts then that, since petitioner reported no gross income from farming for 1969, no deduction should be allowed. Respondent has not argued that petitioner did not conform to the requirements for adoption of the benefits of section 175. See section 175(d).
With respect to deductions for repair expenses, section 1.162-4, Income Tax Regs., provides as follows: Sec. 1.162-4. Repairs. The cost of incidental repairs which neither materially add to the value of the property nor appreciably *112 prolong its life, but keep it in an ordinary efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures.Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept. The Court has previously stated that, in order to determine whether an expenditure is capital in nature or is a current repair expense, it is necessary to consider the purpose for which an expenditure is made. In Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, 106 (1926), we pointed out the distinguishing characteristics of repairs as opposed to capital expenditures: In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while *113 a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired.Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * * Applying the aforementioned principles to the facts of the instant case, we think petitioner effected a partial reconstruction and improvement of the dam rather than an "incidental" repair. The work done on the dam was extensive. The clay seam which was substituted for the old gravelly type dirt ran the entire length of the dam and a very substantial portion of the dam, one-third, was replaced in this operation. The dam itself was larger, although apparently *114 no higher, since the dirt which was removed and stockpiled was also used in the repair work. Common sense tells us that after the work was completed the value and expected life of the dam were increased since the possibility of the dam's breakage, which could occur as a result of the water seepage's carrying off sediment, was lessened. Certainly such work on the dam arrested the deterioration caused by the water seepage. While we realize each case must turn on its own peculiar facts, we think the instant case is similar to Scovill Manufacturing Co., 25 B.T.A. 265 (1932), which involved improvements to a leaking dam. Without deciding whether petitioners are entitled to the benefits of section 175 in future years for their dam work, we hold that the expenses in question are capital expenditures and hence are not deductible under section 162. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and applicable to the taxable year involved, unless otherwise indicated. ↩
1a. We realize that the total purchase price of the aircraft was 880,687.75 according to the order forms and that Gates Aviation Corporation received $885,016 in cash and a $50,000 note from petitioner. We are, however, unable to account for the difference with certainty. Perhaps petitioner's $50,000 note was cancelled upon execution of the $860,016 note. 2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. ↩
3. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC. EXPENSES. (d) Substantiation Required. - No deduction shall be allowed - (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or, (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. ↩
4. Since respondent stipulated the amount of the claimed expenditures, except for the mileage from which the automobile expense was derived and which we think was adequately substantiated at trial, requirement (a) of sec. 274(d) was satisfied. However, the remaining requirements of substantiation, especially the business relationship of the expenditures to the petitioner's trade or business, were not met. See sec. 1.274-5, Income Tax. Regs. We note that certain of petitioner's claimed expenses (i.e. auto expenses, taxi fare and parking) could well be expenses for local transportation as opposed to expenses for travel away from home. These expenses, of course, are not covered by sec. 274(d). See sec. 1.274-5(a) (1), Income Tax Regs.↩ Although in the instant case petitioner has not attempted an allocation of such expenses between local transportation and travel expenses, we will make such an attempt. 4a. We have arrived at these totals by making the following allocations which take into account our above reasoning: ↩
5. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expensed paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management conservation, or maintenance of property held for the production of income * * *. ↩
6. SEC. 263. CAPITAL EXPENDITURES. (a) General Rule. - No deduction shall be allowed for - (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to - * * * (C) soil and water conservation expenditures deductible under section 175. SEC. 175. SOIL AND WATER CONSERVATION EXPENDITURES.
(a) In General. - A taxpayer engaged in the business of farming may treat expenditures which are paid or incurred by him during the taxable year for the purpose of soil or water conservation in respect of land used in farming, or for (b) Limitation. - The amount deductible under subsection (a) for any taxable year shall not exceed 25 percent of the gross income derived from farming during the taxable year. If for any taxable year the total of the expenditures treated as expenses which are not chargeable to capital account exceeds 25 percent of the gross income derived from farming during the taxable year, such excess shall be deductible for succeeding taxable years in order of time; but the amount deductible under this section for any one such succeeding taxable year (including the expenditures actually paid or incurred during the taxable year) shall not exceed 25 percent of the gross income derived from farming during the taxable year. (c) Definitions. - For purposes of subsection (a) - (1) The term "expenditures which are paid or incurred by him during the taxable year for the purpose of soil or water conservation in respect of land used in farming, or for the prevention of erosion of land used in farming" means expenditures paid or incurred for the treatment or moving of earth, including (but not limited to) * * * the construction, control, and protection of * * * earthen dams, * * *. Such term does not include - (A) the purchase, construction, installation, or improvement of structures, appliances, or facilities which are of a character which is subject to the allowance for depreciation provided in section 167, or * * *. (B) any amount paid or incurred which is allowable as a deduction without regard to this section. * * * (2) The term "land used in farming" means land used (before or simultaneously with the expenditures described in paragraph (1)) by the taxpayer or his tenant for the production of crops, fruits, or other agricultural products or for the sustenance of livestock. (d) When Method May Be Adopted. - (1) Without consent. - A taxpayer may, without the consent of the Secretary or his delegate, adopt the method provided in this section for his first taxable year - (A) which begins after December 31, 1953, and ends after the date on which this title is enacted, and (B) for which expenditures described in subsection (a) are paid or incurred. (2) With consent. - A taxpayer may, with the consent of the Secretary or his delegate, adopt at any time the method provided in this section. ↩